MAIN, Justice.
First Union National Bank of Florida (“First Union”), the plaintiff in a declaratory-judgment action filed in the Lee Circuit Court, appeals from a judgment entered in favor of the Lee County Commission (“the Commission”) and Phillip Summers, the defendants in that action. We affirm.
I. Factual Background and Procedural History
The parties stipulated to the following facts:
“1. The real property which is involved in this dispute is designated as parcel number 43-02-05-15-0-000-001.017 and is more specifically described as follows:
“Part of Lot 8 Shady Grove Farms Subdivision, recorded in Plat Book 13, Page 141 in the Office of the Judge of Probate of Lee County, Alabama, being located in Section 15, Township 20 North, Range 28 East, Lee County, Alabama, described as follows: begin *107 at the Northeast corner of said Lot 8 on the South right of way of Lee Country [sic] Road No. 272, thence run South 01 Degrees 23 minutes East 300 feet, thence run South 88 degrees 52 minutes West 146.6 feet, thence run North 01 degrees 2.7 minutes West 300 feet to the South right of way of said highway, thence along said right of way North 88 degrees 52 minutes East 146.6 feet to the Point of Beginning, containing 1.0 acre,
“(hereinafter, the ‘Property’).
“2. During March of 1994, Summers contracted with Jim Walter Homes, Inc. (hereinafter, ‘JWH’) for JWH to build Summers a house to be constructed by JWH on the Property.
“3. On March 22, 1994, Summers executed a Non-Negotiable Promissory Note in the amount of One Hundred Seventeen Thousand Five Hundred Forty and 00/100 Dollars ($117,540.00) for the purchase price of the house to be constructed by JWH on the Property.... In addition, Summers executed a Mortgage on March 22, 1994, securing payment of the debt evidenced by the Non-Negotiable Promissory Note.
“4. The Mortgage was recorded by JWH on April 25, 1994 in the office of the Probate Judge of Lee County, Alabama and can be found at Real Property Book 2092, Pages 122-123.
“5. As a condition of the Mortgage, Summers agreed to ... ‘pay all taxes, assessments, and other liens taking priority over’ the Mortgage.
“6. On June 10, 1994, JWH executed an Assignment of Mortgage purporting to ‘grant, bargain, sell, assign, transfer and set over’ unto Mid-State Homes, Inc. the Mortgage and Non-Negotiable Promissory Note described therein. This Assignment of Mortgage was recorded on October 4,1994 in the office of the Probate Judge of Lee County, Alabama and can be found at Real Property Book 1891, Page 95.
“7. On April 12, 1995, Mid-State Homes, Inc. executed an Assignment of Mortgages purporting to ‘grant, bargain, sell, assign, transfer and set over’ unto Mid-State Trust IV the Mortgage and Non-Negotiable Promissory Note described therein. On the same day, and within the same document, Mid-State Trust IV purports to ‘grant, bargain, sell, assign, transfer and set over’ unto First Union National Bank of Florida the Mortgage and Non-Negotiable Promissory Note described therein. This Assignment of Mortgages was recorded on April 21, 1995 in the office of the Probate Judge of Lee County, Alabama and can be found at Real Property Book 1941, Pages 9-16.
“8. The 2004 ad valorem taxes for the Property were assessed to Summers by the Lee County Revenue Commissioner, Oline Price. The sum of the taxes assessed to Summers was $363.24.
“9. The 2004 ad valorem taxes were not paid. Therefore, the Lee County Revenue Commissioner gave notice that the Property would be sold at public auction. On May 4, 2005, the Property was sold at public auction to a third party, Plymouth Park Tax Services, LLC. Plymouth Park Tax Services, LLC paid $9,600.00 for the Property. The sum of the taxes assessed to Summers, interest, fees, and advertising costs was $447.00. Therefore, the Lee County Revenue Commissioner received an excess in the amount of $9,153.00. Lee County deposited the excess received from the sale into a non-interest bearing fiduciary account.
“10. On August 31, 2007, U.S. Bank, N.A. as successor in interest to Wacho-via Bank, NA, successor by merger to *108 First Union National Bank, formerly known as First Union National Bank of North Carolina and successor by merger to First Union National Bank of Florida, executed a Power of Attorney. The Power of Attorney states: ‘US Bank desires to grant a power of attorney to Walter Mortgage Company and Jim Walter Homes, Inc., upon the terms and conditions set forth herein.’ The terms and conditions of the Power of Attorney state that Walter Mortgage Company and/or JWH are appointed ‘to execute, acknowledge, verify, swear to, deliver, record, and file, in the name, place, and stead of U.S. Bank ... all instruments, documents, and certificates which may from time to time be required in connection with [certain documents].’ The Power of Attorney further states that U.S. Bank ‘may terminate the Power of Attorney at any time by recording in the office where this Power of Attorney is recorded an instrument signed by U.S. Bank.’ The Power of Attorney was recorded on October 17, 2007....
“11. On July 24, 2008, Bill English, Judge of Probate, issued a Tax Deed to Wachovia Custodian for Plymouth Park Tax Services pursuant to ALABAMA CODE § 40-10-29 (1975). The Tax Deed was recorded on August 1, 2008 in the office of the Probate Judge of Lee County, Alabama....
“12. On August 11, 2008, Summers informed a representative of Walter Mortgage Company that the Property had been sold for back taxes. Prior to August 11, 2008, neither First Union nor Walter Mortgage Company had received actual notice of the fact that the Property had been sold at a public auction.
“13. On August 22, 2008, Walter Mortgage Company — acting as attorney-in-fact for First Union pursuant to the Power of Attorney described herein— made a payment directly to Plymouth Park Tax Services, LLC in the amount of $17,880.69 with the intent of effectuating a redemption of the Property.
“14. At the time Walter Mortgage Company paid Plymouth Park Tax Services, LLC, Summers was financially unable to satisfy his tax delinquency.
“15. Upon the instructions of Walter Mortgage Company, and in return for the payment made by Walter Mortgage Company to Plymouth Park Tax Services, LLC, Plymouth Park Tax Services, LLC executed a Quit Claim Deed to the Property to Summers on September 17, 2008. This Quit Claim Deed was recorded on October 14, 2008 in the office of the Probate Judge of Lee County, Alabama....
“16. Following Walter Mortgage Company’s payment to Plymouth Park Tax Services, LLC no person or entity applied for redemption of the Property at the Probate Office or deposited any money with the Judge of Probate in that regard.
“17. On or about July 28, 2009, a Verified Statement of Claim was presented to the Lee County Commission by Walter Mortgage Company on behalf of First-Union. The Verified Statement of Claim claims that First Union is entitled to the $9,153.00 excess arising from the tax sale.
“18. When an application is made to Lee County for the excess proceeds arising from a tax sale, Lee County’s policy is to (1) examine the Certificate of Land Sold for Taxes, (2) identify the person or entity assessed the taxes, (3) request identification to confirm that the person or entity applying for the excess was the person or entity who was assessed the taxes, and (4) if proper identification is presented, pay the excess proceeds to the applicant.
*109 “19. Pursuant to ALABAMA CODE § 6-5-20 (1975), Walter Mortgage Company’s Verified Statement of Claim was disallowed by Lee County by operation of law.
“20. On June 16, 2009, Summers requested the excess proceeds and presented identification.”
William J. Wade, in his capacity as trustee for Mid-State Trust IV, sued the Commission and Summers in January 2009, seeking a judgment declaring who was entitled to the excess redemption proceeds from the tax sale of Summers’s property. Wade later filed a motion to substitute First Union as the real party in interest;[1] the trial court granted the motion. First Union then filed an amended complaint in July 2009, seeking, as did Wade, a judgment declaring who was entitled to the excess redemption proceeds from the tax sale of Summers’s property. The parties agreed to submit the case to the trial court on stipulations, depositions, exhibits, and the parties’ briefs. The Commission then moved for a summary judgment. Summers appeared at the hearing on the Commission’s summary-judgment motion, and the Commission says Summers “informed the Court that his intention was to use any monies received as a result of this action to pay back the debt owed to First Union.” Commission’s brief, at 8. The trial court entered a judgment declaring that Summers was entitled to the excess funds from the tax sale. The trial court stated:
“The issue in this case is whether the Plaintiff First Union National Bank of Florida, as mortgagee, is entitled to receive excess funds held by Lee County pursuant to a tax sale. ALABAMA CODE § 40-10-28 (1975) governs the disposition of excess funds received by a county at a tax sale. Section 40-10-28 states that excess funds ‘shall be paid over to the owner, or his agent, or to the person legally representing such owner, or into the county treasury.’
“After considering the legal arguments of the parties and the facts of this case, the Court hereby finds that the Plaintiff First Union National Bank of Florida, as mortgagee, is not ‘the owner, or his agent, or ... the person legally representing such owner.’ As a result, the Plaintiff First Union National Bank of Florida is not entitled to the excess funds under ALA. CODE § 40-10-28. The Court finds that ‘the owner’ under ALA. CODE § 40-10-28 is the person or entity against whom the taxes were assessed. In addition, the Court finds that the Plaintiff First Union National Bank of Florida has not proven it is the owner’s agent or legal representative.
“Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that the Defendant Lee County Commission is not required to issue a check made payable to the Plaintiff First Union National Bank of Florida. Each party is to bear its own costs.”
(Capitalization in original.)
II. Standard of Review
“Our standard of review of this case is governed by statute. Section 12-2-7(1), Ala.Code 1975, states:
“ ‘[I]n deciding appeals, no weight shall be given the decision of the trial judge upon the facts where the evidence is not taken orally before the judge, but in such cases the Supreme Court shall weigh the evidence and give judgment as it deems just.’
“In a case in which a trial court has not heard live testimony, this Court has held that ‘a reviewing court will not apply the presumption of correctness to a trial *110 court’s findings of fact and that the reviewing court will review the evidence de novo.’ Eubanks v. Hale, 752 So.2d 1113, 1122 (Ala.1999). Our statutory obligation in a case such as this is to ‘weigh the evidence and give judgment as [we] deem[ ] just.’ ”
Bentley Sys., Inc. v. Intergraph Corp., 922 So.2d 61, 70-71 (Ala.2005).
III. Analysis
When a property owner fails to pay taxes owed on real property, the probate court of the county in which the property is located may order the sale of the property. § 40-10-1, Ala.Code 1975. If the purchaser of the property at the tax sale pays more than the taxes owed on the property plus applicable costs and expenses, § 40-10-28, Ala.Code 1975, specifies how the excess funds are to be distributed. Section 40-10-28 provides, in pertinent part:
“The excess arising from the sale of any real estate remaining after paying the amount of the decree of sale, and costs and expenses subsequently accruing, shall be paid over to the owner, or his agent, or to the person legally representing such owner, or into the county treasury, and it may be paid therefrom to such owner, agent or representative in the same manner as ... the excess arising from the sale of personal property sold for taxes is paid. If such excess is not called for within three years after such sale by the person entitled to receive the same, upon the order of the county commission stating the case or cases in which such excess was paid, together with a description of the lands sold, when sold and the amount of such excess, the county treasurer shall place such excess of money to the credit of the general fund of the county and make a record on his books of the same, and such money shall thereafter be treated as part of the general fund of the county. At any time within 10 years after such excess has been passed to the credit of the general fund of the county, the county commission may on proof made by any person that he is the rightful owner of such excess of money order the payment thereof to such owner, his heir or legal representative, but if not so ordered and paid within such time, the same shall become the property of the county.”
In this case, excess funds in the amount of $9,158 were paid to Lee County after Summers failed to pay the ad valorem taxes on the property for 2004. First Union sought the excess funds as the mortgagee and redeemer of the property. Because the trial court held that First Union was not the owner of the property and was not the owner’s agent or the person legally representing him, the trial court held that First Union was not entitled to the excess proceeds.
First Union argues that the trial court’s decision reaches what it says is an inequitable result in that a mortgagee who holds legal title to property and who has redeemed the property after a tax sale cannot recover the excess funds it paid to redeem the property. First Union contends that if effect is given to the plain meaning of § 40-10-28, it would be considered the owner of the property. It contends that, under Alabama law, a mortgagee is the legal “owner” of the real property that is the subject of the mortgage. Because Alabama is a title state, argues First Union, the plain and ordinary meaning of the term “owner” is the person holding legal title. Barclay v. State, 156 Ala. 163, 165, 47 So. 75, 76 (1908) (“The term ‘owner’ must be given, as employed in this act, its primary meaning, which is he who has the title, as distinguished from a mere possessory right, to the premises.”). Al *111 though the law in some states is to the effect that a mortgage is merely a lien on the mortgaged property, First Union says, Alabama is a title state in which the execution of a mortgage passes legal title to the mortgagee as security for the mortgagor’s debt. In support of its argument, First Union cites Trauner v. Lowrey, 369 So.2d 531, 534 (Ala.1979) (“Alabama classifies itself as a ‘title’ state with regard to mortgages. Execution of a mortgage passes legal title to the mortgagee.”); Bank of Powell v. Peoples Bank, 503 So.2d 845, 845-46 (Ala.1987) (“In Alabama, upon the execution of a mortgage, the mortgagee receives legal title.... The mortgagor retains an equity of redemption.”); and Baxter v. SouthTrust Bank of Dothan, 584 So.2d 801, 804 (Ala.1991) (same). Therefore, First Union reasons, at the time of the tax sale, Summers merely held an equitable right of redemption that would ripen into legal title when the debt evidenced by the mortgage was satisfied. Because Summers did not hold legal title, First Union says, he was not the “owner” of the property and was not entitled to the excess funds. A mortgagor has the right to use and convey the property so long as the terms of the mortgage are satisfied and can hold himself out to third parties as the owner, but, First Union argues, the mortgagee is still the legal owner of the property. First Nat’l Bank v. Federal Land Bank of New Orleans, 225 Ala. 195, 196, 142 So. 546, 546 (1932) (“ ‘The mortgagor, remaining in possession of lands, either by virtue of stipulations entitling him so to do, or by grace of the mortgagee, is, as to all persons other than the mortgagee, the owner of the lands.’ ” (quoting Federal Land Bank v. Wilson, 224 Ala. 491, 493, 141 So. 539, 540 (1932))). Of course, First Union says, when a mortgagor fails to comply with the terms of the mortgage, the mortgagee is entitled to immediate possession and the mortgagor loses even equitable title. In this case, the mortgage specifically provides that Summers was responsible for paying the taxes on the property, and his failure to pay those taxes constituted a default. First Union concludes that the trial court’s ruling in this case — that Summers, a defaulted mortgagor who has no rights in the property, is the only party entitled to the excess funds — is incorrect and that First Union is the owner entitled to the excess funds.
The Commission argues that the trial court properly granted its summary-judgment motion because, it argues, First Union, as the mortgagee, is not the owner of the property for purposes of § 40-10-28. The Commission considers Summers to be the owner of the property because the ad valorem taxes on the property were assessed to him, and First Union considers itself to be the owner of the property because it was the mortgagee on the date of the tax sale. The legislature does not define the term “owner” within Chapter 10 of Title 40, Ala.Code 1975, and the parties have not identified any caselaw on point defining “owner” for purposes of § 40-10-28.
There are, however, rules of statutory construction that guide this Court’s interpretation of a statute. In Archer v. Estate of Archer, 45 So.3d 1259, 1263 (Ala.2010), this Court described its responsibilities when construing a statute:
“ ‘ “[I]t is this Court’s responsibility in a case involving statutory construction to give effect to the legislature’s intent in enacting a statute when that intent is manifested in the wording of the statute.... ““ “[I]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’ ” ’ ... In determining the intent of the legislature, we must examine the stat *112 ute as a whole and, if possible, give effect to each section.”
“ ‘Ex parte Exxon Mobil Corp., 926 So.2d 303, 309 (Ala.2005). Further,
“ ‘ “when determining legislative intent from the language used in a statute, a court may explain the language, but it may not detract from or add to the statute.... When the language is clear, there is no room for judicial construction.... ”
“ ‘Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 607 (Ala.2002).’ ”
(Quoting Ex parte Birmingham Bd. of Educ., 45 So.3d 764, 767 (Ala.2009).) Similarly, in Lambert v. Wilcox County Commission, 623 So.2d 727, 729 (Ala.1993), the Court stated:
“ ‘The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute.... In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses ... and words are given their plain and usual meaning.... Moreover, just as statutes dealing with the same subject are in pari materia and should be construed together, ... parts of the same statute are in pari materia and each part is entitled to equal weight.’ ”
(Quoting Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380-81 (Ala.1979).) When other sections in Title 40, Chapter 10, entitled “Sale of Land,” are examined, the meaning of the term “owner” becomes clear. For example, in § 40-10-1, Ala.Code 1975, the statute governing when the probate court may order land sold, the term “owner” refers to the person or entity against whom taxes are assessed:
“The probate court of each county may order the sale of lands therein for the payment of taxes assessed on the lands, or against the owners of the lands, when the tax collector shall report to the court that he or she or the holder of a tax lien ... was unable to collect the taxes assessed against the land, or any mineral, timber or water right or special right, or easement therein, or the owner thereof, without a sale of the land.”
Section 40-10-120(a), Ala.Code 1975, governs when land sold for unpaid taxes may be redeemed, and, more importantly, who may redeem it.
“Real estate which hereafter may be sold for taxes and purchased by the state may be redeemed at any time before the title passes out of the state or, if purchased by any other purchaser, may be redeemed at any time within three years from the date of the sale by the owner, his or her heirs, or personal representatives, or by any mortgagee or purchaser of such lands, or any part thereof, or by any person having an interest therein, or in any part thereof, legal or equitable, in severalty or as tenant in common, including a judgment creditor or other creditor having a lien thereon, or on any part thereof....”
(Emphasis added.) The list of those who can redeem property sold for taxes in § 40-10-120 is broader than the list of those entitled to claim excess proceeds under § 40-10-28. The more expansive language in § 40-10-120 includes both “the owner” and “any mortgagee,” but the narrower language in § 40-10-28 includes only “the owner, or his agent, or ... the person legally representing such owner.” The Commission argues that if the legislature separately named both owners and mortgagees in § 40-10-120, then it could not have intended for the term “owner” in § 40-10-28 to include “mortgagee.” We agree.
*113 First Union attempts to refute the Commission’s argument that provisions in Chapter 10 of Title 40 other than in § 40-10-28 support the interpretation that the term “owner” as used in § 40-10-28 does not include a mortgagee. The Commission, First Union says, contends that the word “owner” in § 40-10-28 could refer only to Summers, the party in possession of the property. First Union argues that it remains the legal title holder of the property and therefore the legal owner of the property, regardless of the fact that Summers retained possession and use of the property and was responsible for paying the taxes on the property.
First Union’s argument presumes that legal title is the equivalent of absolute ownership of property, but that presumption is incorrect. See Alabama Home Mortgage Co. v. Harris, 582 So.2d 1080, 1088-84 (Ala.1991) (recognizing that there is no “absolute owner” of property until there is a merger of equitable title and legal title). First Union’s interpretation of the term “owner” in § 40-10-28 fails to consider the fact that when real property is mortgaged, only legal title passes to the mortgagee, and the mortgagor retains his or her other status as “owner and holder of equitable title.” Sims v. Riggins, 201 Ala. 99, 108, 77 So. 393, 397 (1917) (the mortgagor is “the owner and holder of the equitable title”). Until there has been a foreclosure, the mortgagor continues to “own” the property. Alabama Home Mortgage, 582 So.2d at 1083-84.
First Union criticizes the Commission as citing cases arising out of the insurance context, pointing out that this Court long ago held that a mortgagor was the owner of property for purposes of an insurance policy. One of those cases is Loventhal v. Home Insurance Co., 112 Ala. 108, 20 So. 419 (1896). First Union argues that Lo-venthal determined whether the insurer could void the insurance policy because of the mortgage on the property, holding only that it could not, and that the Court in Loventhal did not address the issue before it in this case. First Union contends that the fact that a mortgagor may be considered an owner for purposes of an insurance policy does not mean that the mortgagor is the legal owner of the property for purposes of § 40-10-28.
Contrary to First Union’s contention, this Court’s decision in Loventhal, in which this Court discussed the distinction between legal title and equitable title, is applicable to this case. In Loventhal, the issue was the meaning of ownership in the context of a contested fire-insurance policy. The Court held that the condition in the fire-insurance policy that the insured’s interest in the property be sole and unconditional was not violated by the fact that there was a mortgage on the property. In so holding, the Court stated:
“The term ‘fee simple’ has never been used to distinguish between legal and equitable estates. It is used to denote the quantity or duration of estates— whether the enjoyment is limited or unlimited in point of continuance or duration. It defines the largest estate in land known to the law. It is an estate of inheritance, unlimited in duration, de-scendible to all the heirs alike of the owner to the remotest generations. It may be of a legal or equitable nature. If of the latter, the legal holder is a mere trustee for the equitable, who is the real owner, and, restrained by no provision of the trust, in cases not within the statute of uses, may at any time be compelled to execute the legal estate in him.”
112 Ala. at 115, 20 So. at 420 (emphasis added). According to Loventhal, equitable title is more than an interest in property; it is ownership of the property. See also *114 Alabama Home Mortgage, 582 So.2d at 1080.
First Union calls this Court’s attention to other jurisdictions that have held that the mortgagee is the owner of the property and is the proper party to collect excess funds following a tax sale. It cites Alexander Investment Group, Inc. v. Jarvis, 263 Ga. 489, 491, 435 S.E.2d 609, 612 (1993), which held that the mortgagee is superior to the mortgagor as to collecting the excess funds under Georgia’s tax-sale statutes. Generally, First Union says, Georgia courts have reasoned that when a lienor/mortgagor causes property to be sold because of the lienor’s/mortgagor’s failure to pay taxes as required by the mortgage, that lienor/mortgagor has no standing to collect the excess funds, especially if the lienee/mortgagee has made a claim for the excess funds. First Union then argues that “[t]he exact same result should be reached in this case” because, it says, Summers should not have standing to collect the excess funds. First Union’s brief, at 23. First Union also cites McKelvey v. Creevey, 72 Conn. 464, 466-67, 45 A. 4, 5 (1900) (mortgagee is owner of land, and as between mortgagor and mortgagee, the mortgagee is regarded as having legal title to the land). In conclusion, First Union argues, there is no authority to support the trial court’s decision in this case that a mortgagor who has not paid taxes on the property and thereby defaulted defeats a mortgagee as to who is the owner of the land. First Union argues that the trial court should have found that First Union was the owner for purposes of § 40-10-28 and was therefore the party entitled to the excess funds.
The Commission calls this Court’s attention to the definition of “owner” in other statutes, such as § 35-11-232, Ala. Code 1975, a statute dealing with materialmen’s liens (“Every person ... for whose use, benefit or enjoyment of any building or improvement shall be made is embraced within the words ‘owner or proprietor,’ as used in this division.”), and § 35-9A-141(9), Ala.Code 1975, relating to landlords and tenants (“one or more persons, jointly or severally, in whom is vested (i) all or part of the legal title to property or (ii) all or part of the beneficial ownership and a right to present use and enjoyment of the premises. The term includes a mortgagee only when in possession....”) Furthermore, the term “owner” in the property-tax-assessment statutes, § 40-7-1 et seq., Ala.Code 1975, clearly refers to the person against whom taxes are assessed. In view of the various Alabama statutes in which the legislature has clearly expressed its intent that the term “owner” of property is not broad enough to include within its definition a mortgagee, we are not persuaded by authority from other jurisdictions in which the term “owner” is more broadly defined. We conclude that when the legislature directs in § 40-10-28 that the excess funds from a tax sale “shall be paid over to the owner, or his agent,” the term “owner” means the person against whom taxes on the property are assessed.
First Union next argues that, even if Summers is considered to be the owner of the property, First Union should at least be considered his legal representative so as to entitle it to the excess funds in that capacity. First Union says that in one of its briefs to the trial court the Commission argued that a mortgagee is a mere trustee for the mortgagor. That is generally not a correct statement under Alabama law, First United says, but, if that is true, it asserts, a trustee is a party’s legal representative, citing Sessions v. Espy, 854 So.2d 515 (Ala.2002) (trustee in bankruptcy is a party’s legal representative). First Union then says that it has shown that, as the mortgagee, it is the *115 legal owner under Alabama law because it holds legal title to the property, but, it argues, even if the Commission is correct that the mortgagee is merely a trustee for the mortgagor, it would also be the proper party to receive the excess funds because it would be the party legally representing Summers.
The Commission contends that First Union did not present to the trial court its argument that the trial court should have at least found it to be the legal representative of the owner. That argument was not well developed in the briefs First Union filed in the trial court, but First Union did make a cursory argument that if it is considered to be only the trustee for the owner, then it should be considered the owner’s legal representative and entitled to the excess funds in that capacity. The Commission relies upon an opinion issued by the Alabama Attorney General answering the following question: “Can anyone other than the true owner make a claim for excess funds arising from a tax sale?” Opinion to Patrick D. Pinkston, Elmore County Attorney, Op. Att’y Gen. No. 2009-058 (March 29, 2009). That opinion references a previous attorney general’s opinion for the proposition that “any excess funds arising from the sale of real estate for unpaid property taxes is properly payable to the former owner, i.e., the person who initially failed to pay the taxes on the property.” Id. (citing Opinion to Preston Hornsby, Macon County Probate Judge, Op. Att’y Gen. No. 88-0401 (July 28, 1983)). The Commission says that Op. Att’y Gen. No. 2009-058 also addresses the specific question of payment to a third party and explains when an agent or trustee for the owner can apply for the excess funds. It states:
“Section 40-10-28 states that the excess can be paid to the owner, his agent, or to the person legally representing such owner. If the third party discussed above has a valid agreement with the prior owner rightfully to obtain the excess, Elmore County could rightfully pay this money over as the third party has become the person legally representing such owner.”
The Commission states that if Summers had executed any written agreement to allow First Union to represent him, such as a power of attorney, the county could rely on that clear statement of authority from Summers to First Union and pay the excess funds to First Union. Anything less, the Commission says, would be inadequate to establish an agency or trustee relationship for a county trying to determine who should receive the excess funds from a tax sale without having to litigate or interplead funds every time the question arose. We agree with the Commission that, in the absence of a written instrument naming First Union as Summers’s legal representative, the trial court correctly held that First Union cannot claim the excess funds on that basis.
Finally, First Union argues that fairness dictates that it be the proper party to collect the excess funds. The Commission argued to the trial court, First Union says, that First Union should not be entitled to the excess funds because it would be burdensome for Lee County to determine the correct mortgagee. First Union refers to this position as a “feigned argument of hardship.” First Union’s brief, at 26. Mortgages are recorded in the probate court of the county in which the property is located, First Union states, and tax sales are ordered by the probate court of that same county. It clearly would not be burdensome, First Union insists, for the probate court to review the records relating to the property being sold and to give notice to the mortgagees, as well as to the delinquent taxpayer, of any excess received at the tax sale. First Union then argues that *116 the Commission has no desire to notify anyone of the excess funds because, it says, the county wants to keep the excess funds; moreover, it alleges, if the delinquent taxpayer is the only one notified of a tax sale and the only one who can claim the excess funds, then the Commission “has found a creative way to greatly increase its coffers.” First Union’s brief, at 27. The trial court’s holding is wrong, First United says, because Summers, who defaulted on a $863.24 property-tax assessment, did not redeem the property. Instead, First Union says, it redeemed the property, paying the $9,153 excess to the third-party tax-sale purchaser, and, as a result of its redemption, Summers was able to keep his home. According to First Union, the trial court’s decision not only allows Summers to keep his home, but also gives him an additional windfall of $9,153 for doing nothing except failing to pay his taxes. Such a result, says First Union, is inconsistent not only with the clear terms of § 40-10-28, but also with basic considerations of fairness and justice.
The Commission argues that public-policy considerations weigh in favor of defining the term “owner” so as not to include a mortgagee. Defining the term to include a mortgagee as well as the person against whom the taxes are assessed, the Commission says, “would create enormous uncertainty for Alabama counties regarding who is entitled to the excess proceeds arising from a tax sale.” Commission’s brief, at 37. The Commission argues that in order to avoid paying the excess funds to the wrong person, the county’s revenue commissioner would have to pay for and/or conduct a title search on the property each time a person called for the excess funds arising from a tax sale. This would be a significant burden, the Commission says, and would not necessarily resolve the uncertainty. Without a specified person who is allowed to claim the excess funds, a county commission’s only alternative would be to interplead the excess funds after every tax sale, which would create substantial attorney fees, filing fees, and costs for the county.
We agree with the Commission that a broad definition of the term “owner” would place an unnecessary burden on counties, especially in light of other remedies that are available to a mortgagee, such as First Union, to protect itself in the event property on which it holds a mortgage becomes subject to a sale for unpaid taxes. For example, many mortgagees place the responsibility for paying ad valorem taxes upon the mortgagor, but set up an escrow account whereby the mortgagee pays the ad valorem taxes, thus protecting itself by assuming the responsibility of paying the property taxes directly to the county on behalf of the owner. Other mortgagees require the mortgagor to pay the ad valo-rem taxes, but if the taxes are not paid, allege that the mortgagor has breached the contract, a breach that allows the mortgagee to foreclose upon the property, purchase it at the foreclosure sale, and thereby merge the equitable title with the legal title, thus becoming entitled to any excess funds. The fact that a mortgagee chooses not to own the property by way of foreclosure should not place a burden on the county or alter the plain meaning of § 40-10-28. A mortgagee could also require the mortgagor to execute a power of attorney as part of an agreement not to foreclose, or, if the mortgagee learns after the fact that property has been sold for taxes, it can require the owner to execute a power of attorney before it redeems the property. The mortgagee could then become entitled to the excess proceeds under § 40-10-28 as the person “legally representing such owner.”
IV. Conclusion
Because we hold that trial court correctly declared (1) that the term “owner” in *117 § 40-10-28 means the person or entity against whom the taxes were assessed, (2) that First Union cannot be considered Summers’s legal representative for purposes of § 40-10-28, and (3) that Summers, and not First Union, is entitled to the excess funds from the tax sale, we affirm the judgment in favor of the Commission and Summers.
AFFIRMED.
COBB, C.J., and STUART, PARKER, MURDOCK, SHAW, and WISE, JJ„ concur.
BOLIN, J., dissents.

. Mid-State Trust IV assigned the mortgage to First Union before the tax sale occurred.