Rel: May 19, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

_____

### SC-2022-0653

_____

### Ex parte J.C. King III

### PETITION FOR WRIT OF CERTIORARI
### TO THE COURT OF CIVIL APPEALS

### (In re: Anderson Realty Group, LLC

### v.

### J.C. King III)

### (Jefferson Circuit Court: CV-20-903660;
### Court of Civil Appeals: 2201014)

STEWART, Justice.

This case concerns the redemption of residential real property sold at a tax sale, and, in particular, it concerns the definition of the term "preservation improvements" as used in the applicable redemption statute, § 40-10-122, Ala. Code 1975. The property at issue ("the property") had served as a rental home located in a residential neighborhood. The property owner, J.C. King III, stopped paying property taxes in 2015 after a fire extensively damaged the property and rendered it uninhabitable. The State of Alabama purchased the property at a 2016 tax sale, and in 2019 the property was ultimately sold in its uninhabitable state to Anderson Realty Group, LLC ("ARG").

ARG spent $88,812 to extensively renovate and restore the property to a habitable condition,[1] and in 2020 it filed a complaint in the Jefferson Circuit Court seeking to quiet title to the property. King filed a counterclaim to redeem the property and disputed whether the extensive renovations to the property could be considered "preservation improvements" due to be included in the redemption amount pursuant to

---

[1]ARG installed new framing, roofing, wiring, plumbing, air conditioning, windows, doors, siding, and gutters.

§ 40-10-122(c). The trial court agreed with King, holding that "preservation improvements" included only those amounts expended by ARG to keep the property from further deterioration,[2] the value of which it concluded was $10,000, and it entered a judgment setting the redemption amount accordingly. ARG appealed, and the Court of Civil Appeals reversed that judgment, holding that the trial court had erred in limiting the "preservation improvements" to the cost of repairs undertaken to keep the property in the same condition it was in at the time of the tax sale. Anderson Realty Grp., LLC v. King, [Ms. 2201014, June 10, 2022] __ So. 3d __, __ (Ala. Civ. App. 2022). We granted King's petition for the writ of certiorari to consider, as a matter of first impression, the meaning of the phrase "preservation improvements" as defined in § 40-10-122(d).

<u>Standard of Review</u>

"'On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court.

---

[2]There was testimony that ARG did $10,000 to $12,000 worth of work that could be characterized as merely maintaining the property, i.e., general clean-up work, securing tarps over the roof, landscaping, and lawn maintenance.

Therefore, we must apply de novo the standard or review that was applicable in the Court of Civil Appeals.'" Ex parte Patel, 988 So. 2d 957, 959 (Ala. 2007) (quoting Ex parte Toyota Motor Corp., 684 So. 2d 132, 135 (Ala. 1996)). Here, the question whether the trial court properly interpreted the phrase "preservation improvements" is a question of law subject to de novo review. See McKinney v. Nationwide Mut. Ins. Co., 33 So. 3d 1203, 1206 (Ala. 2009) (noting that a trial court's interpretation of a statute is a question of law reviewed de novo).

Analysis

When property is sold at a tax sale to a party other than the state, a process for the redemption of that property is provided by § 40-10-122. Generally, to redeem property under that section, the party seeking redemption must pay an amount of money equal to the amount for which the property was sold (including any funds paid in excess of the minimum-bid amount), plus any subsequent taxes paid by the purchaser at the tax sale, with interest -- currently, payable at the rate of 8% per annum from the date of the sale -- as well as other costs and fees. § 40-10-122(a). Moreover, the requirements for statutory redemption of property sold at a tax sale had generally remained the same since the

4

earliest enactment of the statute, regardless of the character or location of the property at issue. See, e.g., § 608, Ala. Code 1886; § 3111, Ala. Code 1923; and Title 51, § 305, Ala. Code 1940.

In 2002, however, the legislature passed Act No. 2002-426, Ala. Acts 2002 ("the 2002 amendment"), which amended § 40-10-122 to require that additional amounts be paid to redeem property sold at a tax sale under two distinct circumstances. First, if the property in question is located within an "urban renewal or urban redevelopment project area designated pursuant to Chapters 2 or 3 of Title 24 [of the Alabama Code]," the redemptioner must pay the cost of certain insurance premiums associated with the property paid by the purchaser and must also pay for the value of all "permanent improvements" made on the property by the purchaser. § 40-10-122(b). "Permanent improvements" are broadly defined by § 40-10-122(d) to include "all repairs, improvements, and equipment attached to the property as fixtures." Second, if the property contains a residential structure, the redemptioner must pay certain insurance premiums associated with the property paid by the purchaser and must also pay for the value of all "preservation improvements" made on the property by the purchaser. § 40-10-122(c).

5

"Preservation improvements" are defined as "improvements made to preserve the property by properly keeping it in repair for its proper and reasonable use, having due regard for the kind and character of the property at the time of sale." § 40-10-122(d).

The parties agree that this case is governed by § 40-10-122(c). They disagree, however, as to the meaning of the term "preservation improvements." When construing statutory language, the following principles are applicable:

> "'"'[I]t is this Court's responsibility in a case involving statutory construction to give effect to the legislature's intent in enacting a statute when that intent is manifested in the wording of the statute …. "'"'[I]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'" … In determining the intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section.'

6

"'"Ex parte Exxon Mobil Corp., 926 So. 2d 303, 309 (Ala. 2005). Further,

"'"'when determining legislative intent from the language used in a statute, a court may explain the language, but it may not detract from or add to the statute…. When the language is clear, there is no room for judicial construction….'

"'"Water Works & Sewer Bd. of Selma v. Randolph, 833 So. 2d 604, 607 (Ala. 2002)."'

"[Archer v. Estate of Archer, 45 So. 3d 1259, 1263 (Ala. 2010)] ([q]uoting Ex parte Birmingham Bd. of Educ., 45 So. 3d 764, 767 (Ala. 2009)[).] Similarly, in Lambert v. Wilcox County Commission, 623 So. 2d 727, 729 (Ala. 1993), the Court stated:

"'"The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute…. In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses … and words are given their plain and usual meaning…. Moreover, just as statutes dealing with the same subject are in pari materia and should be construed together, … parts of the same statute are in pari materia and each part is entitled to equal weight."'

7

"(Quoting Darks Dairy, Inc. v. Alabama Dairy Comm'n, 367 So. 2d 1378, 1380-81 (Ala. 1979).)"

First Union Nat'l Bank of Florida v. Lee Cnty. Comm'n, 75 So. 3d 105, 111-12 (Ala. 2011).

The legislative intent of the 2002 amendment is evident from its express reference to "urban renewal" and "urban redevelopment" project areas authorized pursuant to Chapters 2 and 3 of Title 24, Ala. Code 1975. Those chapters are aimed at reducing urban blight, which, according to legislative findings, "impair economic values and tax revenues, cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals, and welfare of residents of the state." § 24-2-1(a)(2), Ala. Code 1975; see also § 24-3-1(a)(1), Ala. Code 1975. For example, the stated purpose of an urban-renewal project is to create a workable program for

"dealing with the problem of slums and blighted, deteriorated, or deteriorating areas within the community and for the establishment and preservation of a well-planned community with well organized residential neighborhoods of decent homes and suitable living environment for adequate family life[] … [and] to eliminate and prevent the development or spread of slums and blight and deterioration [and] to encourage needed rehabilitation …."

§ 24-3-6, Ala. Code 1975.

8

Furthermore, abandoned, tax-delinquent properties are associated with blight and the deterioration of neighborhoods. <u>See</u>, <u>e.g.</u>, § 24-2-2(c)(8), Ala. Code 1975 (defining "blighted property" to include "property that has tax delinquencies exceeding the value of the property"); § 24-9-2, Ala. Code 1975 (stating that a purpose of the creation of the Alabama Land Bank Authority is acquire tax-delinquent properties in order to rehabilitate the properties and remove blight). However, as commentators have recognized, the redevelopment and rehabilitation of tax-delinquent properties can be problematic. <u>See</u> Andrew S. Olds, Comment, <u>Saving Alabama's Urban Neighborhoods: Revisions to Alabama's Property Tax Sale Laws</u>, 44 Cumb. L. Rev. 497, 501-02 (2013-2014). For example, a tax-sale purchaser will be understandably reluctant to invest funds to restore a property when the previous owner retains the right of redemption.[3] The 2002 amendment, therefore, was

_____

[3]As one commentator has explained:

"Under Alabama's tax sale redemption laws, a private developer who buys a tax certificate at the tax sale generally must wait for a minimum of six years before he can cut off the right of redemption and bring a successful quiet title action. As a result of these obstructions, properties that are otherwise good candidates for redevelopment are out of the investor's reach. [Such properties] often sit vacant until they develop

designed to alleviate risks inherent in a tax-sale purchaser's improvement of a property located in an urban-renewal or urban-redevelopment project area or of a property containing a residential structure. For instance, a redemptioner of a property in an urban-renewal project area would be required to reimburse the tax-sale purchaser for at least the value of "all repairs, improvements, and equipment attached to the property as fixtures." § 40-10-122(d) (defining "permanent improvements").

Likewise, § 40-10-122(c), which was enacted as part of the 2002 amendment, must also be understood as an anti-blight measure intended to stem the deterioration of residential-housing stock. To that end, the 2002 amendment encourages tax-sale purchasers to preserve residential properties by requiring redemptioners to reimburse a tax-sale purchaser for the value of "preservation improvements" made to keep such

---

catastrophic roof leaks or transient interlopers set fire to the properties."

Andrew S. Olds, Comment, Saving Alabama's Urban Neighborhoods: Revisions to Alabama's Property Tax Sale Laws, 44 Cumb. L. Rev. 497, 502 (2013-2014) (footnotes omitted).

residential property "in repair for its proper and reasonable use." § 40-10-122(d) (defining "preservation improvements").

Notably, in defining "preservation improvements," the legislature turned to language from long-standing decisional law concerning foreclosure redemptions. Section 40-10-122(d) defines "preservation improvements" as "improvements made to preserve the property by properly keeping it in repair for its proper and reasonable use, having due regard for the kind and character of the property at the time of sale." This definition is drawn directly from the definition of "permanent improvements," as that term is used in the context of foreclosure redemptions, and, thus, provides us with an idea as to what the legislature intended by the language used to define "preservation improvements" in § 40-10-122(d).

The redemption of property that has been foreclosed upon is governed by § 6-5-253, Ala. Code 1975. That section requires a redemptioner to pay "lawful charges," which include the value of "[p]ermanent improvements." § 6-5-253(a)(1). The definition of "permanent improvements" as used in foreclosure-redemption cases was established by this Court in Rodgers v. Dixon, 239 Ala. 72, 74, 193 So.

11

741, 743 (1940), and was most recently restated by this Court in <u>E.B.</u>

<u>Investments, L.L.C. v. Pavilion Development, L.L.C.</u>, 212 So. 3d 149, 167

(Ala. 2016):

> "'"We have indicated that necessary <u>permanent improvements</u> have a well defined meaning in this jurisdiction, which is to <u>preserve the property by properly keeping it in repair for its proper and reasonable use, having due regard for the necessities of each subject as to its kind and character</u>. This includes not only ordinary repairs to restore the property after injury, decay, storm, flood, or fire, etc., but also valuable and useful additions and improvements to the property suited to its reasonable necessities, character and use. … As to this each case is ruled by its facts."

> "'[<u>Rodgers v. Dixon</u>], 239 Ala. [72,] 74, 193 So. [741,] 743 [(1940)]. In <u>Smith v. Sulzby</u>, 205 Ala. 301, [303,] 87 So. 823[, 824] (1921), this Court stated: "An improvement, generally speaking, is anything that enhances the value of the land."'

> "<u>Moore v. Horton</u>, 491 So. 2d 921, 923 (Ala. 1986)."

 (Emphasis added.) Since 1940, Alabama courts have applied the above

language on numerous occasions. For example, in <u>Moore v. Horton</u>, 491

So. 2d 921 (Ala. 1986), the Court, relying on <u>Rodgers</u>, addressed and

rejected an argument -- like that made by King in this case -- that

"permanent improvements" should not include improvements made to the property beyond what was necessary to keep it from further deterioration during the redemption period. 491 So. 2d at 923.

On direct appeal of this case to the Court of Civil Appeals, that court recognized that, because the definition of "preservation improvements" is taken from essentially the same definition of "permanent improvements," as used and applied for more than 80 years in Alabama decisional law regarding foreclosure redemption, "the legislature must have intended that 'preservation improvements' have the same meaning as ascribed by the <u>Rodgers</u> Court to the term 'permanent improvements' under the foreclosure-redemption statute, § 6-5-253." <u>Anderson</u>, __ So. 3d at ___. The majority explained:

> "It is … a rule of statutory construction that statutes should be construed in reference to the principles of the common law. <u>Dennis v. State</u>, 40 Ala. App. 182, 185, 111 So. 2d 21, 24 (1959); <u>see also</u> <u>Weaver v. Hollis</u>, 247 Ala. 57, 60, 22 So. 2d 525, 528 (1945) (noting that statutes must be read 'in the light of the common law'); <u>Standard Oil Co. v. City of Birmingham</u>, 202 Ala. 97, 98, 79 So. 489, 490 (1918) ('[C]ommon-law words [are to be construed] according to their common-law meaning.'); <u>Cook v. Meyer Bros.</u>, 73 Ala. 580, 583 (1883) ('[T]he common law prevails, save so far as it is expressly or by necessary implication changed by the statute.'); Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 320 (2012) ('The age-old principle is that words undefined in a statute are to be

13

interpreted and applied according to their common-law meanings.'); cf. Ex parte Christopher, 145 So. 3d 60, 65 (Ala. 2013). …

"Applying these principles, we conclude that, because the definition of 'preservation improvements' as codified in § 40-10-122(d) is the same definition of 'permanent improvements' set forth in Rodgers and applied for more than eighty years, the legislature must have intended that 'preservation improvements' have the same meaning as ascribed by the Rodgers Court to the term 'permanent improvements' under the foreclosure-redemption statute, § 6-5-253.

"Here, the tax-sale purchaser obtained its interest in the house after a 'massive' fire. ARG, the tax-sale purchaser's successor in interest, then spent a considerable amount of money toward restoring the house and surrounding property to its previous condition for its 'proper and reasonable use,' i.e., a sound, habitable, single-family dwelling. § 40-10-122(d). Alabama courts have consistently required one seeking to redeem property that has been foreclosed upon to pay not only the costs for ordinary repairs to restore the property after, among other things, a fire 'but also [to pay for] valuable and useful additions and improvements to the property suited to its reasonable necessities, character and use.' Rodgers, 239 Ala. at 74, 193 So. at 743. Therefore, we conclude that the trial court erred in limiting ARG to the recovery of the cost of repairs undertaken to keep the property in the same condition it was in at the time of the tax sale."

Anderson, __ So. 3d at __.

We agree with the above analysis. Consistent with the purpose of the 2002 amendment of reducing residential blight, the legislature required redemptioners of property containing a residential structure to

pay the value of "preservation improvements," a term it defined by adopting language that this Court has previously interpreted to mean "valuable and useful additions and improvements to the property," Rodgers, 239 Ala. at 74, 193 So. at 743, including improvements beyond those necessary to merely prevent further deterioration. Moore, 491 So. 2d at 923. Here, ARG engaged in the precise conduct that the 2002 amendment was intended to encourage -- it invested substantial funds to restore an uninhabitable, abandoned house located in a residential neighborhood to its "proper and reasonable use" as a sound and habitable single-family dwelling. § 40-10-122(d). Accordingly, we agree that the trial court erred in limiting ARG to the recovery of the cost of repairs to keep the property in the same condition it was in at the time of the tax sale.[4]

## Conclusion

For the above reasons, the judgment of the Court of Civil Appeals is affirmed.

AFFIRMED.

---

[4]We make no judgment as to the precise amount due to redeem the property or as to the value of the "preservation improvements."

Parker, C.J., and Shaw, Wise, Bryan, Sellers, Mendheim, Mitchell, and Cook, JJ., concur.