Dr. H. Ray Evers was indicted on two counts of "selling, furnishing, or giving away" amphetamines in violation of §20-2-70 (a), Code 1975. That statute provides in pertinent part:
 "(a) Except as authorized by this chapter, any person who possesses, sells, furnishes, gives away, . . . controlled substances . . . is guilty of a felony and upon conviction, for the first offense may be imprisoned for not less than two nor more than fifteen years. . . ." (Emphasis added.)
The jury found him guilty on both counts and the trial court set sentence at five years' imprisonment. The appellate court affirmed and this appeal followed.
The facts are summarized in the State's brief:
 "It is undisputed that on January 23, 1981, the appellant furnished Johnny Coley prescriptions for two different amphetamines (both categorized as Schedule II drugs) to help Coley combat fatigue while driving his automobile on an alleged round trip between Dothan, Alabama, and Tampa, Florida.
 "Coley had been hired by the appellant to manage the pharmacy and central supply at appellant's own Sealy Springs Health Services Clinic. Coley was a pharmacist but had lost his license to practice in Florida and had not yet obtained an Alabama license. He had worked at the clinic for about six weeks before the January 23, 1981, incidents.
 "Coley's assistance had been requested by Sergeant Charles Odom of the Houston County Sheriff's Department and Agent Bill Regness of the Alabama Bureau of Investigations in their investigation of the appellant, Dr. Evers. At their request, Coley consented to wear a `body-mike' while he solicited drugs from the appellant.
 "On the morning of January 23, 1981, at Coley's request, the appellant gave him a prescription for twenty Biphetamine 20 capsules. Eskatrol, Ridlin [sic] and Dexamyl were discussed as alternatives but Coley opted for Biphetamine 20. Late that afternoon Coley reported to the appellant that one of the Biphetamine 20 capsules had made his mouth too dry, so the appellant furnished him another prescription for fifteen Eskatrol capsules.
 "Both conversations between the appellant, Evers, and Coley, which prompted the appellant to furnish Coley the two amphetamine prescriptions, were transmitted via the `body-mike' and were received and recorded by Odom and Regness who were positioned in the vicinity of the clinic. The tape recordings of these conversations as well as the testimonies of Coley and Odom were presented to the jury as proof of the allegedly illegal transactions involving this appellant.
 "The prosecution also presented, as its medical expert, Dr. Sam C. West, Jr. Dr. West testified that prescribing amphetamines `for the purpose of keeping someone awake to take a trip' would not be `in the course of medical practice or legitimate medical practice.' He further stated that to insure against undesirable `reactions', the minimum prerequisites for prescribing amphetamines would be a review of the patient's medical history and an examination to check his pulse and blood pressure. Dr. West also described some of the hazards of taking amphetamines for prolonged periods while driving, e.g. impaired judgment, confusion, delirium, paranoid delusions, and visual hallucinations, among others. Finally, after an extensive voir dire examination *Page 815 
with reference the predicate for admitting an excerpt from The Physician's Desk Reference, and after an unrecorded bench conference, Dr. West was allowed to read warnings from that text that amphetamines should be used only in weight reduction programs and that they might `impair the ability of the patient to engage in potentially hazardous activities such as operating machinery or vehicles.'
 "The appellant did not deny that he furnished the prescriptions to Coley for the sole purpose of combating fatigue during Coley's alleged trip. It was and is appellant's contention, however, that his actions did not violate § 20-2-70 (a) as charged, nor any other Alabama statute.
 "Appellant's secretary, Doris Molliston, testified that Mr. Coley saw the appellant as a patient on January 19, 1981. She stated that she thought Coley was seeking treatment for a `cold' and that she, consequently, completed an `out-patient' identification form (which she identified at trial) and began an `out-patient' file for him. She further reported that Coley's visit on the afternoon of January 23, 1981, was again for the appellant's professional services. She stated that she pulled his file on that occasion, gave it to the appellant and returned it to the file at the conclusion of Coley's visit, after the appellant had made some notations with reference the visit. She stated that this record remained in her files `until it was pulled out for the purposes of this case.'
 "Opieree Barbaree, appellant's nurse, testified that on January 19, 1981, she briefly participated in the appellant's examination of Coley and witnessed the appellant examine Coley's bare chest with a stethoscope and inspect his throat with the aid of a tongue depressor. She stated that the appellant let her go, after only a few minutes, because Mr. Coley only had a cold.
 "On cross-examination, Molliston stated she had worked for the appellant in Montgomery, Alabama, and in the Bahamas prior to the move to Houston County, and Barbaree testified that she had worked for the appellant since 1959.
 "The appellant's medical expert was Dr. James Cooper, a friend of the appellant and one of his associates in Atlanta, Georgia, for several years. Dr. Cooper testified that it was `in the course of professional practice and for a legitimate medical purpose' for the appellant to furnish his employee, whom he had known and worked with for six weeks and who was himself a registered pharmacist, the two amphetamine prescriptions to combat fatigue while driving his automobile.
 "On cross-examination, however, Dr. Cooper admitted that he had never prescribed amphetamines to combat fatigue, that he would not prescribe them for truck drivers, and that he had occasionally refused specific requests for that very purpose. He stated that he would not furnish anyone, even a pharmacist, with `anything he wanted' but might give someone amphetamines if that person insisted upon driving while fatigued.
 "Dr. Cooper also testified that he agreed with the warning in the Physician's Desk Reference that amphetamines might impair one's ability to operate an automobile but stated that he did not normally warn his patients accordingly and, in fact, he did not recognize the Physician's Desk Reference as a primary medical authority.
 "He agreed that `the smallest quantity of drugs feasible should be prescribe d at one time in order to minimize the possibility of over-dosage' and reported that one Biphetamine 20 capsule would `last' for about ten to twelve hours.
 "Finally, in rebuttal to the appellant's evidence that Johnny Coley was seen as a patient by the appellant on January 19, 1981, and January 23, 1981, [which Coley had previously denied at trial] the prosecution elicited testimony from Sergeant Odom that on January 25, 1981, he conducted a thorough search of the patient records at the Sealy Springs Health Services Clinic and did not find a patient record for Johnny Coley. After the search was completed the appellant, who *Page 816 
had already been advised of his Miranda rights, told the authorities that those were all of his medical records."
The court of appeals held that § 20-2-70 (a) applies to licensed physicians:
 "Appellant contends that § 20-2-70 (a) does not apply to licensed physicians. In support of this contention he presents a detailed analysis of the law in several other jurisdictions. We appreciate these attempted analogies with other jurisdictions with allegedly similar statutes, but we find them unpersuasive.
 "We need not look any further than our own Alabama statutes and cases to reach the conclusion that § 20-2-70 (a) indeed applies to licensed physicians. In fact, § 20-2-70 (a) proscribes certain illegitimate conduct irrespective of the apparent status of the perpetrator. [See State v. Bradford, 368 So.2d 317, 320 (Ala.Cr.App. 1979)]."
We do not disagree with that conclusion. However, that court erred by misstating the issue presented by Dr. Evers on appeal. Evers does not contend a physician could not be charged and convicted of the illegal possession, sale, or furnishing of controlled substances. Rather, the issue raised by Evers at trial and on appeal is whether § 20-2-70 (a) is applicable to a licensed physician writing a prescription which is within thescope of his registration.
Respondent contends the words "sell, furnish, and give away" were intended by the Legislature to have a broad, general application. Petitioner contends that, had the Legislature intended that the statute proscribe the writing of a prescription by a physician for other than a legitimate medical purpose, it would have used a more descriptive word such as "dispense" or "prescribe" to define the prohibited act. We agree.
Well settled rules for construction of criminal statutes guide our determination of this issue. In United States v.Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936), the United States Supreme Court considered the applicability of a statute making a misdemeanor the sale of vegetable hampers not complying with certain dimension specifications. That Court held that, because hampers of the size manufactured by defendant were not mentioned in the Act, his conduct could not be made criminal:
 "Statutes creating crimes are to be strictly construed in favor of the accused; they may not be held to extend to cases not covered by the words used. . . ."
299 U.S. at 209, 57 S.Ct. at 127. Accord, Fuller v. State,257 Ala. 502, 60 So.2d 202, 205 (1952); State v. Bradford,368 So.2d 317, 320 (Ala.Cr.App. 1979).
In State v. Bradford, the Alabama Court of Criminal Appeals recently determined a statute which provides that it is unlawful for practitioners of dentistry and veterinary medicine to prescribe certain drugs could not be construed as applicable to physicians. That court stated:
 "It would take a strained and convoluted construction to apply the criminal sanctions of § 505 to a physician. One of the most elementary principles governing cases is that criminal statutes must be construed in favor of the persons sought to be subjected to their operation. Schenher v. State, 38 Ala. App. 573, 90 So.2d 234, cert. denied, 265 Ala. 700, 90 So.2d 238 (1956)."
368 So.2d at 320.
The appellate court quoted from Young v. State, 58 Ala. 358
(1877):
 "`One who commits an act which does not come within the words of a penal statute, according to the general and popular understanding of them, when they are not used technically, is not to be punished thereby, merely because the act contravenes the policy of the statute.'" (Emphasis added.)
368 So.2d at 320.
Dr. Evers was convicted of "selling, furnishing, or giving away" amphetamines. We do not think those terms sufficiently describe the action of a physician prescribing a controlled substance within the scope of his registration. Illustrative of this conclusion is testimony on cross examination *Page 817 
by the "victim," pharmacist Johnny Wayne Coley:
 "Q And he didn't give you any of these pills, did he?
"A No, sir.
"Q He didn't sell you any pills?
"A No, sir.
"Q He didn't furnish you any pills?
"A No, sir.
 "Q So, he neither gave, sold nor furnished you with any pills?
"A No, sir."
We think it is clear Dr. Evers did not commit an act violative of § 20-2-70 (a) as its terms are "generally or popularly" defined.
Further, it is well established that criminal statutes should not be "extended by construction." Locklear v. State,50 Ala. App. 679, 282 So.2d 116 (1973). The trial court incorporated part of the language from § 13A-2-22, Code 1975, in its oral charge to the jury. That statute provides that a person is:
 "legally accountable for the behavior of another, if acting with the culpable mental state sufficient for the commission of the offense in question, he causes an innocent person to engage in such behavior."
Section 13A-2-22 is a part of the new Alabama Criminal Code. It did not go into effect until 1 January 1980, almost 10 years after the Controlled Substances Act took effect. Obviously, at the time § 20-2-70 (a) was enacted it was meant to stand on its own. Had the trial court not included the language of §13A-2-22, the jury may well have determined that Dr. Evers's conduct did not constitute "selling, furnishing, or giving away" controlled substances. An attempt to enlarge the scope of § 20-2-70 (a) via such strained construction will not be allowed.
For the above reasons we find the Court of Criminal Appeals erred in holding § 20-2-70 (a) applicable to a licensed physician writing a prescription which is within the scope of his registration. Therefore, we must reverse the decision of the Court of Criminal Appeals, 434 So.2d 804, and remand this case to that court for action by it consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
MADDOX, J., recused.