On Application for Rehearing

JOINER, Judge.
This Court’s opinion issued on April 17, 2015, is withdrawn, and the following opinion is substituted therefor. Dwayne Anthony Collier, Sr. (“Dwayne”),[1] was convicted of first-degree hindering prosecution, see § 13A-10-43, Ala.Code 1975.[2] Dwayne was sentenced to 10 years’ imprisonment; that sentence was split, and he was ordered to serve one year and one day imprisonment followed by three years’ probation. Dwayne was ordered to pay a $50 crime-victims-compensation assessment and court costs. We reverse the conviction and render a judgment of acquittal for Dwayne.

Facts and Procedural History

Dwayne’s conviction was based on his allegedly rendering criminal assistance to his son, Dwayne Anthony Collier, Jr. (“Anthony”), after the murder of Edward Dickinson. The indictment against Dwayne reads as follows:
“The Grand Jury of said County charge, that, before the finding of this indictment, Dwayne Anthony Collier, Sr., whose name is to the Grand Jury otherwise unknown than as stated, did, with the intent to hinder the apprehension, prosecution, conviction, or punishment of Dwayne [Anthony] Collier, Jr., for an offense constituting a Class A or B felony, to-wit: murder, in rendering criminal assistance by concealing the shotgun used to kill Edward Dickinson and/or falsely reporting to law enforcement that he shot Edward Dickinson, in violation of § 13A-10-43 of the Code of Alabama.”
(C. 18.)
Dwayne, Dickinson, and David Johnston lived in separate mobile homes in a mobile-home park on Bellingrath Gardens Road in Mobile County. At trial, Johnston testified that, around 9:30 P.M. on June 2, 2012, he and Dwayne were inside Johnston’s mobile home when they heard Anthony arguing loudly with Dickinson. Johnston testified that he and Dwayne listened to them argue “for a minute or two” before Dwayne suggested that they “check on this and see what is going on.” (R. 41.) Johnston stated that, when he got to his door, he saw Anthony standing outside the front door to Dickinson’s mobile home, and he knew Dickinson was sitting on his couch inside his mobile home because he could see Dickinson’s legs. Johnston testified that Dwayne suddenly began running toward Anthony, but, before Dwayne could reach him, Anthony fired two gunshots into Dickinson’s mobile home. Johnston stated that Dwayne grabbed the gun, which fired again, this time into the air. Johnston testified that he telephoned emergency 911 and told Dwayne to calm Anthony down. Johnston testified:
“A. And [Anthony] was going ballistic and Dwayne runs back over and says, What do you want me to do with the gun?’ I said, ‘Just throw it down on the ground, put it up against a tree, do whatever you want to do with it because I have got [911] on the phone, they are coming.’
[[Image here]]
*270 “Q, What about the gun? You said he brought the gun to you initially and you told him to just throw it down or whatever?
“A. Yeah. At first he put it in the back of my truck and I didn’t know it was in there until I looked in the back of my truck. I am like, ‘"Whoa, whoa, whoa, Dwayne, get that’—Then [Anthony’s] mama come out there. I said, You have got to get that thing out of my truck.’ He finally—Anthony was over there screaming, his head is busted open, he is carrying on. Dwayne was going to put it over there. I said, Tut it up against a tree.’ I said, ‘I don’t care what you do with it, just get away from me. Throw it out in the woods or whatever,’ I said, ‘The police are on their way, they are going to find it.’
“Q. Did you see what he did after he took it out of your truck?
“A, No, I didn’t. I thought he had put it back in the trailer like he should have did.
“Q. Back in his trailer, you mean?
“A. No, no, just throwed [sic] it down by the back of Bill’s trailer, you know.”
(R. 46-49.) Johnston testified that Dwayne then “jumped on top of [Anthony] and held him down until the police cars were pulling up.” (R. 48.)
Deputy Troy Fisher of the Mobile County Sheriffs Department testified that he responded to the scene of the incident and that, when he arrived, Dwayne was restraining Anthony. Deputy Fisher stated that Dwayne was thereafter “secured in a patrol car” and that Anthony was secured in an ambulance “[d]ue to the laceration on his head.” (R. 87.)
Deputy Johnny Thornton of the Mobile County Sheriffs Department testified that he was dispatched to the Mobile Infirmary West hospital “to check on the condition of [Dickinson.]” (R. 94.) Dickinson eventually died as a result of a gunshot wound to his chest. Deputy Thornton testified that, the following morning, he met Cpl. Bailey of the Mobile County Sheriffs Department at the scene of the incident, and they “canvassed the area because [they] understood the weapon was in the woods.” (R. 96.) Deputy Thornton stated that he discovered the gun in a wooded area approximately 300 feet from the crime scene and that Cpl. Bailey first photographed and then collected the gun.
State’s Exhibit 73—a disk containing seven audio-recorded statements Dwayne made to law enforcement—was played for the jury. Dwayne’s first three statements were recorded at the crime scene. In those statements, Dwayne described the gun used to shoot Dickinson and admitted to throwing that gun in the wooded area behind the mobile-home park. Dwayne also maintained that he was the shooter and that he fired the gun once or possibly twice but that he had not intended to kill Dickinson. Dwayne stated that Dickinson and Anthony had been arguing and throwing “concrete bricks” at each other and that Anthony’s face had been badly injured and was bleeding profusely.
Dwayne’s fourth and fifth statements were made while he was in the custody of law enforcement, and Dwayne reiterated that he had fired the gun but had not intended to shoot Dickinson. Dwayne stated that he “threw the gun up and aimed at the side” of Dickinson’s mobile home and that he later “tossed [the gun] in the woods.” (State’s Exhibit 73, Track 4.) Dwayne also stated that Anthony never fired the gun that night. In Dwayne’s sixth statement, he maintained that he did not “remember exactly what happened” and requested an attorney. (State’s Exhibit 73, Track 6.) Detectives discontinued *271 the interview after Dwayne requested counsel.
In Dwayne’s seventh and final statement, he admitted that he had not been completely honest in his prior statements. Dwayne stated that, after Anthony and Dickinson began arguing and throwing “bricks” at one another, Dwayne went to his mobile home to retrieve his gun. Dwayne said that he had intended to fire the gun into the air to “get everyone’s attention” and to break up the fight. (State’s Exhibit 73, Track 7.) Dwayne stated that, when he went to retrieve the gun from the location where he normally kept it in the mobile home, the gun was not there. Dwayne stated that he then returned to Dickinson’s mobile home and that Anthony was holding the gun. Dwayne stated that he attempted to take the gun away from Anthony and that Anthony fell backwards. Dwayne stated that the gun fired twice into the air and that Anthony fired the gun once more from the ground. Dwayne stated that he was unaware of exactly who took the gun from his mobile home or how Anthony came to possess it. Dwayne confirmed that he did toss the gun into the woods.
Dwayne moved for a judgment of acquittal at the close of the State’s case and renewed his motion after the defense rested. The trial court denied his motion. After the jury returned a guilty verdict and the trial court adjudicated him guilty of first-degree hindering prosecution, Dwayne filed a written motion for judgment of acquittal pursuant to Rule 20.3, Ala. R.Crim. P., in which he claimed that “[t]he evidence in this case does not support, establish, or prove criminal assistance as defined by law.” (C. 43.) The trial court denied his motion.

Standard of Review

“[Dwaynej’s case involves only an issue of law and the application of the law to undisputed facts. Therefore, our review is de novo. Ex parte Walker, 928 So.2d 259, 262 (Ala.2005).” Yearby v. State, 95 So.3d 20, 22 (Ala.Crim.App.2012).

Discussion

On appeal, Dwayne contends that neither “concealing the shotgun used to kill Edward Dickinson [nor] falsely reporting to law enforcement that he shot Edward Dickinson is providing criminal assistance” (Dwayne’s brief, p. 8) as that term is defined in § 13A-10-42, Ala.Code 1975, and as is required for a first-degree hindering-prosecution conviction pursuant to § 13A-10-43. Specifically, Dwayne claims that his actions did not amount to criminal assistance because, he says, the language of §§ 13A-10-42(4) and (5), Ala.Code 1975, “relates to an act that hinders discovery of the location of the perpetrator, not an act that hinders the discovery of who the perpetrator is” and that “[t]he term ‘discovery of such person’ means to find or locate the person; it does not mean to identify who the person is.” (Dwayne’s brief, p. 11.)
Dwayne was indicted and tried under § 13A-10-43(a), Ala.Code 1975, which provides: “A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person.” Section 13A-10-42 provides:
“For the purposes of Sections 13A-10-43 through 13A-10-45, a person renders ‘criminal assistance’ to another if he:
“(1) Harbors or conceals such person;
“(2) Warns such person of impending discovery or apprehension; except that this subdivision does not apply to a warning given in connection with an *272 effort to bring another into compliance with the law;
“(3) Provides such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension;
“(4) Prevents or obstructs, by means of force, deception or intimidation, anyone except a trespasser from performing an act that might aid in the discovery or apprehension of such person;
“(5) Suppresses, by an act of concealment, alteration or destruction, any physical evidence that might aid in the discovery or apprehension of such person.”
The parties do not dispute: (1) that Dwayne falsely told police that he shot Dickinson; (2) that Dwayne took the shotgun used to shoot Dickinson and .put it in the woods near the scene; and (3) that Anthony was apprehended by police after Dwayne had.put the shotgun in the woods but before Dwayne made the false statements to police. Thus, the issue before this Court is whether the term “discovery” as used in the definition of “criminal assistance” at § 13A-10-42, Ala.Code 1975, is limited to the discovery of the physical location of “such person” or whether it includes learning information that “such person” was involved in a crime.[3] Therefore, we must determine the meaning of the phrase “discovery ... of such person” as it is used in § 13A-KM2, Ala.Code 1975.
The legislature does not define the phrase “discovery ... of such person” within Chapter 10 of Title 13, Ala.Code 1975.
“There are, however, rules of statutory construction that guide this Court’s interpretation of a statute. In Archer v. Estate of Archer, 45 So.3d 1259, 1263 (Ala.2010), [the Alabama Supreme] Court described its responsibilities when construing a statute:
“ ‘ “ ‘[I]t is this Court’s responsibility in a case involving statutory construction to give effect to the legislature’s intent in enacting a statute when that intent is manifested in the wording of the statute.... “ ‘ “ ‘[I]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.’ ” ’” ... In determining the intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section.’
“ “Ex parte Exxon Mobil Corp., 926 So.2d 303, 309 (Ala.2005). Further,
“ ‘ “ “when determining legislative intent from the language used in a statute, a court may explain the language, but it may not detract from or add to the statute.... When the language is clear, there is no room for judicial construction.... ’
“ ‘ “Water Works & Sewer Bd. Of Selma v. Randolph, 833 So.2d 604, 607 (Ala.2002).” ’
“(Quoting Ex parte Birmingham Bd. of Educ., 45 So.3d 764, 767 (Ala.2009).) Similarly, in Lambert v. Wilcox County Commission, 623 So.2d 727, 729 (Ala. 1993), the Court stated:
“ ‘ “The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute.... In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses ... and words are *273 given their plain and usual meaning. ... Moreover, just as statutes dealing with the same subject are in pan materia and should be construed together, ... parts of the same statute are in pari materia and each part is entitled to equal weight.” ’
“(Quoting Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380-81 (Ala.1979).)”
First Union Nat’l Bank of Florida v. Lee County Comm’n, 75 So.3d 105, 111-12 (Ala.2011).
“ ““ “[Cjriminal statutes must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed.” ’ United States v. Bridges, 493 F.2d 918, 922 (5th Cir.1974).
“ ‘ “ ‘In United States v. Boston & M. RR Co., 380 U.S. 157, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965), the Supreme Court stated:
“ ““ “A criminal statute is to be construed strictly, not loosely. Such are the teachings of our cases from United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37 [(1820)], down to this day. Chief Justice Marshall said in that case:
“ ““ “ ‘The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.’ Id., p. 95.
“ ““ “The fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition. United States v. Weitzel, 246 U.S. 533, 38 S.Ct. 381, 62 L.Ed. 872 [ (1918) ].”
“ ‘ “ ‘Moreover, “one ‘is not to be subjected to a penalty unless the words of the statute plainly impose it[.]’ Keppel v. Tiffin Savings Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 49 L.Ed. 790 [ (1905) ]. ‘[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.’ United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222, 73 S.Ct. 227, 229-230, 97 L.Ed. 260 [(1952)].” United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971).’
“ ‘ “Bridges, 493 F.2d at 923.” ’
“Crawford v. State, 100 So.3d 610, 615 (Ala.Crim.App.2011).”
J.D.I. v. State, 77 So.3d 610, 616 (Ala.Crim.App.2011).
“ ‘ “[A]mbiguous criminal statutes must be narrowly interpreted, in favor of the accused.” United States v. Herring, 933 F.2d 932, 937 (11th Cir.1991). “[I]t is well established that criminal statutes should not be ‘extended by construction.’ ” Ex parte Evers, 434 So.2d 813, 817 (Ala.1983)....”’ D.A.D.O. v. State, 57 So.3d 798, 802 (Ala.Crim.App.2009) (quoting Carroll v. State, 599 So.2d 1253, 1264 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993)). “ ‘ “No person is to be made subject to penal statutes by implication and all doubts concerning their interpretation are to predominate in favor of the accused. Fuller v. State, [257 Ala. 502, 60 So.2d 202 (1952)].’”” D.A.D.O., 57 So.3d at 803 (quoting Hankins v. State, 989 So.2d 610, 618 (Ala.Crim.App.2007)).
As noted above, Dwayne’s argument suggests that the word “discovery,” as *274 used in the definition of “criminal assistance,” should be construed in the narrow sense of discovering Anthony—i.e., locating Anthony—rather than in a broader sense that would include discovering the fact that Anthony was involved in a crime.
In Ex parte Burton, 783 So.2d 887, 891 (Ala.2000), the Alabama Supreme Court addressed the issue of rendering criminal assistance under § 13A-10-42(4). The Court reversed Angela Burton’s fírst-de-gree-hindering-prosecution conviction and rendered a judgment of acquittal.
“Burton’s conviction was based on her allegedly rendering criminal assistance to her sister, Felicia Scott, and her sister’s boyfriend, Frederic Polion, following the murder of Carethia Curry. Curry was nine months pregnant when she was shot twice in the head after having her stomach cut open and her baby taken out. Burton’s indictment read as follows:
“‘The Grand Jury of said County charge that before the finding of this Indictment, ANGELA BURTON, whose name is otherwise unknown to the Grand Jury, did render criminal assistance to Felicia Scott ... and/or Frederic Polion ... by intentionally hindering the apprehension, prosecution, conviction, or punishment of Felicia Scott ... and/or Frederic Polion ... for conduct constituting a Murder or a Class A or B felony, to wit: Murder, in that said defendant did prevent or obstruct, by means of deception, law enforcement officers and investigators, and/or the Tuscaloosa County, Alabama, Grand Jury, investigating the disappearance of Carethia Curry, from performing an act that might aid in the discovery or apprehension of the said Felicia Scott ... and/or Frederic Polion ... to wit: locating the body of Carethia Curry, in violation of Section 13A-10-43 of the Code of Alabama.’ ”
783 So.2d at 889-90 (footnotes omitted). Burton was charged with first-degree hindering prosecution after making false statements to police.
“ ‘Burton lied to police on February 10, 1996, about placing telephone calls to hospitals in the early morning of February searching for Scott. Her telephone records showed that these calls were not made. She also stated that Polion had telephoned her several times from his and Scott’s home during the very early morning hours of February 1, 1996, searching for Scott and wanting Burton to find out if Scott was at the hospital. The last of these calls was allegedly at 4:48 a.m. Telephone records did not show that any calls were placed from Polion’s home to Burton at that time.’ ”
783 So.2d at 892. The Court held that Burton’s false statements were insufficient to sustain her conviction and stated:
“[T]he indictment charged that Burton hindered prosecution by preventing investigators from performing an act— specifically, locating Curry’s body—that might have aided in the discovery and apprehension of Scott and Polion.... Burton’s falsehoods regarding the telephone calls between her and Polion could not have prevented investigators from discovering Scott and Polion, because these statements were made after Scott and Polion had been apprehended on February 8, 1996, in Gwinnett County, Georgia. Thus, under the indictment, the purpose of locating Curry’s body was to aid in discovering and apprehending Scott and Polion.”
783 So.2d at 892. The Court further stated that Burton “could be found guilty on hindering prosecution only if she was found to have prevented investigators from ‘performing an act that might aid in the *275 discovery or apprehension’ of Scott and Polion. Once Scott and Polion were apprehended, Burton could not have prevented investigators from discovering or apprehending them.” Id.
The State cites Nichols v. State, 500 So.2d 92 (Ala.Crim.App.1986), for the proposition that making false statements to police constitutes rendering criminal assistance for the purposes of a first-degree-hindering-prosecution conviction. The facts of the Nichols case are limited to the following:
“[T]he appellant with intent, knowingly, willingly or consciously hindered the apprehension, prosecution, conviction, or punishment of Randy Johnson for the offense of rape in the first degree. It is clear from the testimony at the trial that [Nichols] knowingly, willingly, and consciously lied to the criminal investigators concerning the circumstances of the rape. [Nichols] alleges that he did so not with the intent to hinder prosecution, but because he was scared.”
500 So.2d at 95. Nichols does not state exactly what happened—for example, it is unclear whether Nichols lied to investigators before or after Johnson was apprehended. Moreover, Nichols speaks specifically to the element of the intent to hinder prosecution and not to the discovery of the principal actor. In any event, Burton, supra, decided 14 years after Nichols, rejects the notion that merely making false statements to police after the apprehension of the principal supports a conviction for first-degree hindering prosecution.
Other states have interpreted their hindering-prosecution statutes in a manner consistent with Burton. Oregon’s hindering-prosecution statute is nearly identical to Alabama’s; the Oregon statute provides:
“A person commits the crime of hindering prosecution if, with the intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony, or with the intent to assist a person who has committed a crime punishable as a felony in profiting or bene-fitting from the commission of the crime, the person:
“(a) Harbors or conceals such person; or
“(b) Warns such person of impending discovery or apprehension; or “(c) Provides or aids in providing such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; or
“(d) Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person; or
“(e) Suppresses by an act of concealment, alteration or destruction physical evidence which might aid in the discovery or apprehension of such person; or
“(f) Aids such person in securing or protecting the proceeds of the crime.”
Or.Rev.Stat. § 162.325(1).
In State v. Werdell, 340 Or. 590, 136 P.3d 17 (2006), a case with facts similar to the instant case, the Oregon Supreme Court held that a defendant’s actions did not constitute hindering prosecution because, at the time the action was taken, the principal actor was in custody and, therefore, the defendant lacked the requisite intent to prevent the discovery or apprehension of the principal. Setting out the facts in the light most favorable to the State, the court stated:
“[Werdell]’s adopted adult son, Everts, who has a felony record, a history of alcohol and substance abuse, and a his *276 tory of brandishing weapons, was involved in a boating accident in October 2000 off the Southern Oregon coast. A friend of Everts died in the accident. Everts was operating the boat; he had been drinking at the time. When he had recovered sufficiently from the injuries that he suffered in the accident, he was lodged in the Curry County Jail for violating his probation by drinking alcohol. Eventually, he was charged with negligent homicide in Curry County.
“A day or two after the accident, Everts’s girlfriend, Hagen, went to the campsite in Curry County where Everts had been camping at the time of the accident to collect Everts’s truck and his other belongings. While doing so, she discovered a gun in a cooler that belonged to Everts. Everts was a convicted felon and, as such, was not permitted to possess a gun. Hagen also discovered a partially consumed bottle of tequila. She brought everything to her home in Medford (Jackson County) and called [Werdell], who also lives in Medford. [Werdell] went to Hagen’s home and retrieved the gun and the bottle of tequila. He disposed of the bottle in the trash. He took the gun to Applegate Lake in Jackson County and tossed it into the water.
“Some time later, after Everts had been released from jail for the probation violation (but before his conviction on the negligent homicide charge), Everts assaulted Hagen. She called the police and lodged a complaint against him. Soon thereafter, Hagen told a domestic violence counselor that charges were pending against Everts in Curry County. The counselor advised her to notify the Curry County District Attorney about the assault. A Curry County police officer then called Hagen to interview her in connection with the assault complaint and, during that interview, Hagen mentioned the fact that Everts had had the tequila and the gun in his possession at the time of the boating accident. She also told the police of [Werdell]’s involvement in disposing of those items.
“The police arrested [Werdell] on the charge of hindering prosecution. [Wer-dell] testified fully before a Curry County grand jury, which indicted him for that crime.... Before trial, [Werdell] demurred to the indictment on [the] ground[ ] ... that ORS 162.325 does not apply to his conduct because the disposal of the gun ... in no way impeded the state’s ability to discover or apprehend Everts, particularly in light of the fact that Everts was in custody at the time that [Werdell] acted....
“... [Werdell] appealed his conviction to the Court of Appeals, which affirmed. The Court of Appeals agreed with the trial court that the hindering prosecution statute, ORS 162.325, applies to the destruction of evidence that might lead the police to discover that a crime had been committed.”
Werdell, 340 Or. at 592-93,136 P.3d at 18-19. Werdell petitioned the Oregon Supreme Court to review the Oregon Court of Appeals’ judgment based on its conclusions (1) that ORS 162.325 “‘focuses on the suppression of evidence that might link a person with the commission of a particular crime, not with merely identifying and arresting the person, without regard to the reason.’ [State v. Werdell, 202 Or.App. 413, 419, 122 P.3d at 86, 89 (2005) ],” and (2) that “the fact that a person is in custody on an unrelated matter is irrelevant.” 340 Or. at 595,136 P.3d at 19.
The Oregon Supreme Court granted Werdell’s petition and concluded that the Court of Appeals incorrectly interpreted the word “discovery” in the statute to *277 mean “learning something unknown.” 340 Or. at 595, 136 P.3d at 20. The Court stated:
“[t]he plain words of the statute ... mean that the true issue is whether defendant suppressed evidence that ‘might aid in the discovery or apprehension of such person,’ that is, ‘a person who has committed a crime punishable as a felony.’ The issue is not whether defendant suppressed evidence that might have aided in the discovery of the fact that such a person had committed a crime.”
340 Or. at 595, 136 P.3d at 20. “The ‘discovery with which [Or.Rev.Stat. 162.325(l)(e) ] is concerned is the discovery of a particular ‘person who has committed a crime punishable as a felony.’ Those words will not stretch to cover the ‘discovery ... that a known person has committed a crime punishable as a felony.’ ”[4] 340 Or. at 597,136 P.3d at 20.
The court further concluded that subsections (a)-(e) of Or.Rev.Stat. 162.325(1) “plainly are directed at conduct that would tend to make it more difficult to discover the location of a known perpetrator and to place that person in custody.” 340 Or. at 596,136 P.3d at 20. The Court stated that subsections (a) through (e) of Or.Rev.Stat. 162.325(1)
“are concerned with the same thing, viz., locating or apprehending a felon. Not one of the other four paragraphs of subsection (1)—(a) to (d)—even arguably is about discovery of a crime. Applying the familiar principle of ejusdem gener-is, we conclude from its similar focus and wording that paragraph (e) is similarly limited in scope. See, e.g., Dear-born v. Real Estate Agency, 334 Or. 493, 500-01, 53 P.3d 436 (2002) (illustrating application of principle to limit scope of one statutory subsection in light of limited scope of other subsections).”
340 Or. at 597,136 P.3d at 21.
The Missouri Court of Appeals interpreted a similar hindering-prosecution *278 statute in State v. McMasters, 815 S.W.2d 116 (Mo.Ct.App.1991). In that case, McMasters had been convicted under a statute that provided:
“A person commits the crime of hindering prosecution if for the purpose of preventing the apprehension, prosecution, conviction or punishment of another for conduct constituting a crime he ... [prevents or obstructs, by mean of force, deception or intimidation, anyone from performing an act that might aid in the discovery or apprehension of such person.”
McMasters was charged with violating that statute for falsely telling police that his cousin, Cowart—who had been convicted for selling marijuana and had failed to turn himself in to the sheriffs office—was not hiding inside McMaster’s house to avoid being captured by law enforcement. Shortly after McMasters made that statement, Cowart was apprehended as he left McMasters’s house.
The Court of Appeals found that, in order to be convicted under that particular statute, “[t]he deception must prevent or obstruct the police from performing an act in aiding in the discovery or apprehension of’ the person who committed the underlying crime and that “[i]n the absence of evidence of prevention or obstruction of some act [that might aid in the discovery or apprehension of such person] there is no violation ... of the statute,” 815 S.W.2d at 118. Based on its conclusion that “there was no evidence that the police were prevented or obstructed from doing anything by [McMasters]’s lie,” the Court reversed McMasters’s conviction. Id.
There is seemingly contrary authority from Arkansas, which holds that a defendant may be convicted of hindering prosecution even though his actions occur after the principal has been placed in custody; as discussed below, however, the statutory language at issue in the Arkansas case differs from the relevant language at issue here and in the cases we have discussed above. In Puckett v. State, 328 Ark. 355, 944 S.W.2d 111 (1997), Puckett was convicted of hindering apprehension or prosecution because he hid the firearm used in a murder and an attempted murder and because he removed fingerprints from that firearm. Puckett claimed that “his actions took place after Calvin [Adams, the suspect,] had already been apprehended, identified, and had confessed to the crimes. Consequently, he contended] the language in provision (a)(4) precluded] its applicability to the facts in [his] case.” Puckett, 328 Ark. at 358, 944 S.W.2d at 113.
Arkansas’s hindering-apprehension or prosecution statute, at issue in that case, provided:
“(a) A person commits an offense under this section if, with purpose to hinder the apprehension, prosecution, conviction or punishment of another for an offense, he:
“(1) Harbors or conceals such person; or
“(2) Provides or aids in providing the person with a weapon, money, transportation, disguise, or other means of avoiding apprehension, discovery, or effecting escape; or
“(3) Prevents or obstructs anyone from performing an act which might aid in the discovery, apprehension, or identification of the person by means of force, intimidation, or the threat of such, or by means of deception; or
“(4) Conceals, alters, destroys, or otherwise suppresses the discovery of any fact, information, or other thing related to the crime which might aid in the discovexy, apprehension, or identification of the person; or
*279 “(5) Warns the person of impending discovery, apprehension, or identification; or
“(6) Volunteers false information to a law enforcement officer.”
(Emphasis added.) The Arkansas Supreme Court held that, pursuant to sub-paragraph (a)(4) of the statute, the “State showed that, with purpose, [Puckett] hindered the prosecution, conviction, or punishment of Calvin Adams by suppressing evidence that might have aided the State in identifying Calvin Adams as having committed the ... crimes.” 328 Ark. at 358, 944 S.W.2d at 113. The Court found that Puckett’s actions were prohibited by the statute, regardless of the fact that Adams was in custody at the time Puckett acted. Id.
Although the holding in Puckett appears contrary to the holdings of Burton, supra, Werdell, supra, and McMasters, supra, the language of Arkansas’s hindering-prosecution statute and how that language has been construed differ significantly from Alabama’s, Oregon’s, and Missouri’s comparable statutes. First, Arkansas’s statute includes the phrase “identification of the person.” Black’s Law Dictionary defines “identify” as “[t]o prove the identity of (a person or thing).” Black’s Law Dictionary 862 (10th ed.2014). Because in the subsections at issue in the statute, a person may be discovered, apprehended, and/or identified, it is logical to conclude that the definition of “discovery” in these subparagraphs is limited to physically locating the person and that the word “identification” is included to cover the learning of new information about “such person” that will connect him to the crime(s) he has committed.
Moreover, the language of subsections (a)(1) and (a)(2) in the Arkansas statute deal with physical acts only and do not include the word “identification.” Subsection (1) speaks only to harboring or concealing a person, which are purely physical acts. Subsection (2) speaks to providing a person with “means of avoiding apprehension, discovery, or affecting escape,” which—with the exception of the word in question, “discovery”—when used in this context, are also purely physical acts. Black’s Law Dictionary defines “apprehension” as “[s]eizure in the name of the law; arrest.” Black’s Law Dictionary 122 (10th ed.2014.) Black’s defines “escape” as: (1) “The act or an instance of breaking free from confinement, restraint, or an obligation”; and (2) “An unlawful departure from legal custody without the use of force.” Black’s Law Dictionary 661.
In addition, the Arkansas statute includes a separate subsection that prohibits the act of providing false information to law enforcement in the crime of hindering apprehension or prosecution. Looking at the plain language of the statute and construing each subparagraph together and giving each equal weight, we reach the logical conclusion that Arkansas’s legislature intended to specifically include the act of lying to police as a separate and equally significant element of its hindering-apprehension or prosecution statute.
Neither Alabama’s nor Oregon’s nor Missouri’s hindering-prosecution statute includes the word “identification,” nor do they include a subsection specifically setting out making false statements as an element of hindering prosecution.[5] Be *280 cause Arkansas’s statute is sufficiently distinct from the other hindering-prosecution statutes underlying the decisions discussed in this opinion, the Puckett decision is not persuasive here.
Turning ■ directly to the language of § 13A-10-42, Ala.Code 1975, we first examine the word “discovery.” Black’s Law Dictionary defines “discovery” as the “act or process of finding or learning something that was previously unknown.” Black’s Law Dictionary 564. Merriam-Webster’s Collegiate Dictionary defines “discovery” as “the act or process of discovering” and, in turn, defines “discover” as “to make known or visible” and “to obtain sight or knowledge of for the first time.” Merriam-Webster’s Collegiate Dictionary 331 (11th ed.2003). “Discovery,” therefore, may be described as learning any previously unknown information. What Dwayne argues—and what Burton, supra, and most of the above-cited cases suggest—is that “discovery” in the definition of “criminal assistance” is limited to learning previously unknown information about the physical location of a person, place, or object previously not seen. In other words, Dwayne argues that the word “discovery,” as that word is used in the definition of “criminal assistance,” has a limited, specific meaning. In order to determine the legislature’s intent upon defining “criminal assistance,” we must “look to the statute as a whole and, if possible, give effect to each section.” First Union Nat’l Bank of Florida, 75 So.3d at 111.
The State in its brief on application for rehearing argues that § 13A-10-42 provides “five alternative means of rendering ‘criminal assistance,’ ” and, the State argues, § 13A-10-42(5) “really supports the conviction.” (State’s brief on application for rehearing, p. 11.) As noted above, the issue before this Court is the meaning of phrase “discovery ... of such person” as that phrase is used in § 13A-10-42(4) and (5) to define “criminal assistance” for the purposes of a first-degree-hindering-prosecution conviction. Accordingly, in considering the meaning of the term “discovery ... of such person” in § 13A-10-42(4) and (5), we examine the remaining subsections of § 13A-1CM2, Ala.Code 1975, construing those sections together and giving them equal weight.
The language of subsections (1) through (3) of § 13A-1CM2 focuses on discovering the physical location of a person who has committed a crime. Subsection (1) defines “criminal assistance” as “harboring or concealing a person.” Black’s Law Dictionary defines “harboring” as the “act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien.” Black’s Law Dictionary 831 (emphasis added). Black’s defines “concealment” as: (1) “The act of preventing disclosure or refraining from disclosing; esp., the injurious or intentional suppression or nondisclosure of facts that one is obligated to reveal”; and (2) “The act of removing from sight or notice.” Black’s Law Dictionary 349 (emphasis added). Construing those two words together and giving them equal weight, it is logical to conclude, because the sole definition of “harboring” is concerned with providing a person—especially one who may be hiding from law enforcement—a physical place with which to remain for a time, that the legislature intended to invoke the definition of “conceal” that describes the act of physically hiding a person rather than the definition that pertains to the mere nondisclosure of information. Moreover, this Court has previously construed “conceal” as stated in the definition of “criminal assistance” to *281 describe physically hiding a person who was avoiding detection by law enforcement. See Yearby v. State, 95 So.3d 20 n. 5 (emphasis added) (“Yearby’s attempt to conceal Jonathan in the air duct constitutes ‘criminal assistance’ as that term is used in § 13A-10-43, Ala.Code 1975.”).
Subsection (2) of § 13A-10-43, Aa.Code 1975, defines “criminal assistance” as warning “such person of impending discovery or apprehension.” Black’s defines “warning” as the “pointing out of danger, esp. to one who would otherwise not be aware of it.” Black’s Law Dictionary 1818. Black’s defines “danger” as “[p]eril; exposure to harm, loss, pain, or other negative result.” Black’s Law Dictionary 476. Thus, like subsection (1), subsection (2) focuses on conduct aimed at preventing law enforcement from determining a person’s location.
Subsection (3) of § 13A-10-43, Aa.Code 1975, defines “criminal assistance” as providing “such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension.” This subsection prohibits giving a person money, transportation, weapons, or disguises to either alter that person’s location or appearance or otherwise to provide a means of physically avoiding capture by law enforcement. Construing those words together and giving them equal weight, it is logical to conclude that, when applied to the word “discovery,” they refer to the physical discovery of a person and not to the mere learning of previously unknown information about a person already in police custody.
Ater considering Burton, supra, as well as Oregon’s and Missouri’s decisions based upon similar fact patterns and nearly identical statutes, and strictly construing § 13A-10-42 in favor of the defendant, and entitling the subsections of that statute equal weight, we hold that the phrase “discovery ... of such person” as set out in § 13A-10-42 is limited to finding or locating a person and does not include identifying such person as being involved with or connected to the committing of a crime.
Dwayne’s false statements that he, and not Anthony, was the person who shot Dickinson could not, under the circumstances here, have prevented investigators from discovering or apprehending Anthony, because those statements were made after Anthony had been apprehended.[6] The State presented no evidence indicating that Anthony had either not been discovered or apprehended at the time Dwayne made the false statements. On the contrary, the undisputed evidence from two of the State’s witnesses—Johnston and Deputy Fisher—was that Dwayne restrained Anthony until law-enforcement officers arrived at the scene. Similarly, although there was evidence indicating that Dwayne had moved to the woods the gun used to shoot Dickinson, the State presented no *282 evidence that Dwayne’s moving of the gun into the woods hindered or prevented law enforcement from discovering or apprehending Anthony.[7]
In Burton, the Alabama Supreme Court held:
“ ‘A defendant is constitutionally entitled to be informed of the nature and the cause of the accusation against him. The function of the indictment is to inform the accused of the crime with which he is charged, so that he may prepare a defense if one is available. The person accused of a crime is required at trial to answer only the specific charge contained in the indictment.’
“Ex parte Washington, 448 So.2d 404, 407 (Ala.1984) (citations omitted).”
788 So.2d at 892. Dwayne was required to answer only the specific charge contained in the indictment and, thus, could be found guilty of first-degree hindering prosecution only if he was found to have rendered “criminal assistance”—as that term is defined in § 13A-10-42—to Anthony. Under the language of the indictment, and pursuant to §§ 13A-10-42 and 13A-10-43, Dwayne’s culpability could stem only from rendering criminal assistance in a manner that prevented Anthony’s discovery or apprehension. Once Anthony was in custody, Dwayne could not have prevented investigators from discovering or apprehending him. Because Dwayne made his false statements after Anthony was apprehended, and because Dwayne’s moving of the gun into the woods did not prevent the discovery or apprehension of Anthony, the State failed to present a prima facie case of hindering prosecution, as alleged in the indictment, and the trial court should have granted Dwayne’s motion for a judgment of acquittal.

Conclusion

Based on the foregoing, we reverse the judgment of the trial court and render a judgment of acquittal.
APPLICATION FOR REHEARING OVERRULED; OPINION OF APRIL 17, 2015, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND JUDGMENT OF ACQUITTAL RENDERED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. The appellant’s son, Dwayne Anthony Collier, Jr., was a codefendant in this case; he was charged with and found guilty of murder, see § 13A-6-2, Ala.Code 1975.

. Dwayne was also charged with murder, see § 13A-6-2, Ala.Code 1975, and with discharging a firearm into an occupied building, see § 13A-11-61, Ala.Code 1975. The jury found him not guilty of those charges.

. For the purposes of a first-degree-hindering-prosecution conviction, the crime must be murder or a class A or B felony. See § 13A-10—43(a), Ala.Code 1975.

. In its brief on application for rehearing, the State argues that this Court's reliance on Wer-dell, supra, was misplaced because, it says, the Oregon Court of Appeals distinguished Werdell in State v. Harding, 213 Or.App. 536, 162 P.3d 305 (2007), by holding that, if evidence showed that the defendant concealed a shotgun after another person used the shotgun to shoot the victim and before the shooter was identified, at the time the defendant concealed the shotgun the gun might have aided in police’s discovery or apprehension of the shooter as required under Oregon’s hindering-prosecution statute. Harding, however, expressly rejects the State’s argument:
"Defendant’s subsequent reliance on [Wer-dell] is therefore misplaced. In Werdell, the defendant disposed of a gun that constituted evidence linking his son to the commission of a felony of which the police were unaware. At the time the defendant disposed of the evidence, his son was in police custody for an unrelated crime. The Supreme Court rejected the state’s proposed extension of the statute to cover the 'suppress[ion] of evidence that might have aided in the discovery of the fact that such a person had committed a crime.’ 340 Or. at 595-96, 136 P.3d 17 (emphasis in original). The focus of that decision was the misapplication of the word ‘discovery’ in ORS 162.325(l)(e) to the fact that a knovrn person has committed an unknown felony rather than to the identity of an unknown person who has committed a felony of which the police are already aware. Id. at 596-97, 136 P.3d 17, This case involves exactly the sort of situation to which the statute does apply, according to the Supreme Court in Wer-dell—the concealment of evidence that would aid in the discovery of the person who committed a felony.”
State v. Harding, 213 Or.App. 536, 541-42, 162 P.3d 305, 307 (2007) (emphasis added). In the instant case, even if Dwayne’s throwing the gun in the woods constituted "concealment," it did not prevent law enforcement from “discovering” Anthony under the circumstances here. Indeed, the undisputed evidence indicated that Dwayne restrained Anthony at the crime scene until police arrived.

. Indeed, Alabama has a separate statute that makes lying to law-enforcement authorities a crime. Section 13A-10-9, Ala.Code 1975, provides:
"(a) A person commits the crime of false reporting to law enforcement authorities if he knowingly makes a false report or causes the transmission of a false report to law *280 enforcement authorities of a crime or relating to a crime.
"(b) False reporting to law enforcement authorities is a Class A misdemeanor.”

. In its brief on application for rehearing, the State contends that whether Anthony had actually been "apprehended" at the time Dwayne made false statements to police was disputed by the State. The State argues that "Deputy Fisher testified that when he arrived, [Dwayne] was holding down Anthony and that Anthony was secured in an ambulance because of a laceration to his head. (R. 86-87.)” (State’s brief on application for rehearing, p. 12 (emphasis in original)). The State argues that Deputy Fisher’s use of the word "secured” did not mean "apprehended.” Deputy Fisher testified for the State on direct examination, however, that Dwayne was "secured” in a patrol car. (R. 87.) Further, the State, in its brief on appeal in Anthony’s case (CR-14-0601), states that Dwayne "jumped on top of [Anthony] and held him down until deputies arrived. (R. 131.)” (State’s brief, CR-14-0601, pp. 2-3.) Therefore, we do not agree with the State’s assertion on appeal that it disputed at trial that Anthony was taken into custody at the scene.

. Dwayne informed law enforcement of the location of the gun at the first opportunity.