WISE, Justice.
Two of the defendants below—Bobby Cockrell, Jr., and Cockrell & Cockrell (“the Cockrell law firm”) (hereinafter collectively referred to as “the Cockrell defendants”)—filed for permission to appeal pursuant to Rule 5, Ala. R.App. P., from *326 the Tuscaloosa Circuit Court’s partial denial of their motion for a summary judgment as to legal-malpractice claims the plaintiff below, Juakeishia Vonshai Pruitt,[1] filed against them. We affirm the trial court’s order denying the Cockrell defendants’ motion for a summary judgment as to malpractice claims alleging that the Cock-rell defendants were vicariously liable for fraudulent misrepresentations made to Pruitt by an associate at the Cockrell law firm intended to conceal the existence of underlying legal-malpractice claims.

Facts and Procedural History

The legal-malpractice claims in this case arose from Byron House’s representation of Pruitt from late 2000 until January 2012. House worked as an associate with the Cockrell law firm from September 1995 until January 2012. This case involves House’s handling of Pruitt’s claims with regard to four separate causes of action'—Pruitt’s discrimination and breach-of-contract claims against Stillman College; Pruitt’s sexual-discrimination claims against her employer Averitt/i3; Pruitt’s claims against Gwendolyn Oyler arising from an automobile accident; and Pruitt’s breach-of-contract claims against A + Photography.

Pruitt’s Claims Against Stillman College

In late 2000, Pruitt, then an employee of Stillman College, consulted House regarding employment issues she was having as a result of her pregnancy. In December 2000, House wrote a letter to Pruitt’s supervisor regarding Stillman College’s treatment of Pruitt. Pruitt’s son was born on March 7, 2001, but Pruitt alleged that she continued to have issues with Stillman College regarding her employment after he was born. Pruitt stated that, in September 2001, she resigned her employment with Stillman College based on House’s advice. Pruitt stated that, after she resigned, House told her he was going to file a complaint against Stillman College alleging discrimination and breach of contract. Pruitt testified that it was her understanding that her action against Stillman College remained pending until the summer or early fall of 2006 and that, at that time, House told her that he had settled the case. Pruitt executed a document titled “General Release” that purported to set forth the details of the settlement. The release provided for a structured settlement of $212,500. The settlement indicated that $212,500 would be invested in an annuity; that Pruitt would receive an initial lump-sum payment of $25,000; that Pruitt would receive 59 monthly payments of $3,541.66; that the total disbursement would be $233,957.94; and that the initial payment would be payable on November 1, 2006. She also executed paperwork allegedly regarding an annuity. Pruitt stated that House told her that Stillman College was taking care of his attorney fees. She also stated that she started receiving payments shortly after she executed the settlement agreement and that she received the checks directly from House and the Cockrell law firm. The checks were written on the Cockrell law firm’s trust account. Pruitt initially received monthly installments of $3,541.66. However, she stated that, in early 2009, House told her that the company handling the annuity had failed financially and that she could either reduce her monthly payments by roughly one-half or take a very small lump sum; that she told House that she would take the reduced payments; that, in April 2009, she started receiving monthly payments of $1,980; and that she received payments of *327 $1,980 until January 2012. Additionally, House wrote a letter dated August 21, 2007, to a representative of First Federal Bank, apparently at Pruitt’s request. In that letter, House stated, in pertinent part, that, as the result of a settlement reached in 2006, Pruitt had received a lump sum of $25,000; that Pruitt was to receive “sixty (60) monthly payments in the amount of $3,541.66”; that, at the time of the letter, she had received “five (5) of the sixty (60) payments”; and that “[t]he payment of these funds is subject to all judicial sanction.” House sent a similar letter dated March 3, 2011, to Audria Collins of Wells Fargo Bank, again at Pruitt’s request. In that letter, House stated that Pruitt was the beneficiary of a structured settlement that provided for monthly payments of $1,980 for 72 consecutive months starting on April 6, 2009. He also asserted that “[sjaid payments are made by a representative of the settling party via this office.”
However, the undisputed evidence established that House never actually filed an action against Stillman College on Pruitt’s behalf.

Pruitt’s Claims Against Averitt/iS

In April 2006, Pruitt started working for Team One, which provided employees for i3 at the Averitt facility in Tuscaloosa. Pruitt asserted that, while working for Av-eritt/iS, she was sexually harassed by one of her supervisors; that she reported the problems to the company; that she was forced to change assignments after reporting the harassment; that she was unable to perform the duties that were given to her at that time; and that she was ultimately forced to resign. Pruitt initially consulted a different attorney, Benjamin Woolf, regarding her sexual-discrimination claims against Averittyi3, and Woolf sent a demand for settlement of Pruitt’s claim to “Ai3 Logistics” dated January 5, 2007. Subsequently, Woolf filed a discrimination charge with.the Equal Employment Opportunity Commission (“the EEOC”). On October 4,2007, the EEOC sent a notice of right to sue to Pruitt and Woolf. The notice provided:
“Your lawsuit under Title VII ... must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice or your right to sue based on this charge will be lost.”
Pruitt stated that, within a couple of weeks after she received that notice, she went to see House about her action against Aver-itt/iS and that, ultimately, she, House, and Woolf decided that House would handle her sexual-discrimination case against Av-eritt/iS. Pruitt testified that House subsequently told her that he had filed an action against Averitt/i3' and that the case was proceeding. She also testified that she made several inquiries about the status of that case and that House reassured her that the case was progressing in anticipation of trial. At one point, House gave her a list of potential jurors to review in anticipation of a trial he said was scheduled for late 2011. Throughout the process, House informed her that, in addition to preparing for trial, he was also discussing settlement with the Averitt/i3 defendants. Pruitt stated that, in October 2011, she and House agreed that they would negotiate to settle the Averitt/i3 case for 1.65 million dollars; that House reiterated the conversation with her in December 2011; and that. House told her that the case was going to be settled for that amount but that he was ironing out some details about when the amount would be paid. However, the undisputed evidence established that House never filed, an action against Averitt/iS.
' Pruitt's Claims Against Oyler
In February 2008, Pruitt was a passenger in an automobile that was stopped in *328 the drive-thru line of a restaurant when it was struck from behind by a vehicle being driven by Gwendolyn Oyler. Pruitt alleged that Oyler was intoxicated at the time of the accident. She also alleged that her neck and back were injured as a result of the accident and that she received medical treatment for her injuries. Shortly after the accident, Pruitt hired House to pursue claims resulting from the accident. House wrote a letter to Oyler dated March 12, 2008, regarding the accident.
In February 2010, House told Pruitt that he had settled her case against Oyler; that she would receive $5,000; and that her medical expenses would be paid. Pruitt received a $5,000 check from the Cockrell law firm in February 2010. Her medical expenses, however, were never paid. Pruitt testified that she did not learn until January 2012 that her medical expenses had not been paid and that, until that time, House had assured her that he had taken care of payment of all of her medical expenses associated with the accident. Again, the undisputed evidence established that House never filed an action against Oyler regarding the February 2008 accident.

Pruitt’s Claims Against A+ Photography

On November 26, 2007, Pruitt entered into an agreement for A+ Photography to provide photography services for her January 19, 2008, wedding. Pruitt alleged that, pursuant to the contract, A+ Photography agreed to provide her with photographs from her wedding and pre-wedding activities. Pruitt testified that the cost of services was $800; that she paid that amount in full; and that A+ Photography did not provide her with all the photographs as agreed. She also stated that in 2009 House agreed to represent her in a breach-of-contract action against A+ Photography.
In 2011, House told Pruitt that a judgment in the amount of $5,000 had been entered against A+ Photography on her behalf; that they should settle the case for $1,500 to satisfy the judgment; and that on June 9, 2011, she received $1,500 from the Cockrell law firm’s trust account. She also stated that House told her that, as part of the settlement, she would receive the photographs she had contracted for; however, she never received any of the photographs she understood to be part of the settlement, and each time she inquired about the photographs on several occasions after June 2011 House either told her they were to be delivered soon or had some explanation to delay her. The evidence established that House never filed a breach-of-contract action against A+ Photography.

Pruitt’s Malpractice Claims

The evidence established that Pruitt did not learn that House had not filed complaints with regard to any of these four underlying claims until January 2012. Pruitt stated that in December 2011 she requested information from House regarding the case number for her Averitt/i3 case because she wanted to contact the court and get more information on the case; that House provided her with the EEOC claim number for her claim, but not a circuit court case number; and that she tried to use the EEOC claim number to get information about the case, but the court clerks told her that the EEOC claim number was not sufficient. Pruitt testified that, in early January 2012, she had an appointment with House at his office and that House did not show up for the appointment. Pruitt stated that, according to House, the meeting was to go over documents to finalize settlement discussions with regard to her claims against Averitt/i3.
*329 Subsequently, Pruitt met with another attorney, Delaine Mountain. During that meeting, House called Pruitt on her cellular telephone, and Mountain listened to that conversation. On January 18, 2012, Mountain made two telephone calls to Cockrell to discuss Mountain’s concerns regarding House’s handling of Pruitt’s discrimination cases. Cockrell twice confronted House in light of the information he had received from Mountain. Eventually, House told Cockrell that he had missed the statute of limitations on both discrimination cases; that there was no structured settlement in the Stillman College case; and that he had taken money for the alleged settlement payments from the Cock-rell law firm’s general business account and trust accounts. The Cockrell law firm immediately terminated his association with the firm.
On March 1, 2012, Pruitt sued House, Cockrell, and the Cockrell law firm. The complaint alleged a legal-malpractice count pursuant to the Alabama Legal Services Liability Act, § 6-5-570 et seq., Ala.Code 1975 (“the ALSLA”). The Cockrell defendants answered and pleaded the ALSLA statute of limitations for legal-malpractice claims as a bar to Pruitt’s claims against them.
On March 20, 2018, Pruitt filed her first amended complaint. The amended complaint alleged malpractice under the ALS-LA, asserting:
“49. The Defendants failed to perform their duties in the same manner as an attorney in Alabama who possessed and exercised ordinary and reasonable legal skills and knowledge and [were] therefore guilty of negligence and/or wantonness in that they failed to preserve [Pruitt’s] potential claims and litigate those claims as an ordinary and prudent attorney.
“50. The Defendants made oral and written statements of material facts as well as suppressed material facts with the intent of deceiving and defrauding [Pruitt].
“52. At no time prior to the 12th day of January 2012 did [Pruitt] discover or could have reasonably discovered there was a malpractice claim against the Defendants arising out of their actions and/or inactions with regard to Pruitt’s cases being handled by the [Defendants.
“53. As a proximate result of the Defendants’ said negligence and/or wantonness, [Pruitt] was caused to suffer economic damage[], mental anguish and emotional distress.”
The complaint also sought punitive damages “because of Defendants’ wanton misconduct.”
On March 22, 2013, the Cockrell defendants filed a motion for a summary judgment as to Pruitt’s claims against them. In their brief in support of their motion for a summary judgment, the Cockrell defendants argued, in part, that Pruitt’s legal-malpractice claims against them were barred by the two-year statute of limitations set forth in § 6-5-574, Ala.Code 1975. They asserted that Pruitt’s legal-malpractice claims would have accrued at the time the statute of limitations on her underlying actions expired. With regard to the malpractice claims arising from House’s handling of Pruitt’s claims against Stillman College, the Cockrell defendants asserted that a Title YII charge must be filed with the EEOC within 180 days after the discrimination occurs; that the limitations period for filing a charge with EEOC regarding those claims expired in mid 2001; and that Pruitt thus had until mid 2003 to file a malpractice claim arising from the handling of her discrimination claim against Stillman College.
*330 With regard to House’s handling of Pruitt’s claims against Averitt/i3, the Cockrell defendants asserted that Pruitt’s Title VII claims, as to which she had received notice of right to sue from the EEOC, had to be filed within 90 days after receipt of that notice; that the 90-day period for filing suit against Averitt/iB expired on January 3, 2008; and that the statute of limitations for Pruitt’s legal-malpractice claim arising from the handling of her discrimination claim against Averitt/i3 expired on January 3, 2010.
With regard to Pruitt’s claims against Oyler, the Cockrell defendants alleged that the statute of limitations on that claim expired in January 2010. Therefore, they argued that the statute of limitations for Pruitt’s malpractice claim arising from the handling of that claim expired in January 2012.
Because Pruitt did not file her claims until March 2012, the Cockrell defendants argued that 'all of her malpractice claims, except for the claim arising out of House’s handling of the action against A+ Photography, were barred by the two-year statute of limitations set forth in § 6-5-574(a), AkuCode 1975.
The Cockrell defendants also argued that, even if Pruitt asserted that, pursuant to § 6-2-3, AkuCode 1975, House’s fraudulent misrepresentation or fraudulent concealment of his malpractice tolled the statute of limitations for her legal-malpractice action, Pruitt’s malpractice claims arising from the handling of her claims against Stillman College and Averitt/i3 are nonetheless barred by the four-year statute of repose set forth in § 6-5-574. They argued that, under the statute of repose, Pruitt’s malpractice claim arising from the handling of her discrimination claims against Stillman College was barred no later than mid 2005 and that her malpractice claim arising from the handling of her discrimination claim against Averitt/i3 was barred after January 3,2012.
On July 25, 2013, Pruitt filed her response to the Cockrell defendants’ motion for a summary judgment. In her response, Pruitt argued that none of her claims was time-barred. Pruitt agreed that all of her claims were subsumed within the ALSLA. Additionally, she did not dispute that § 6-5-574 sets forth a two-year statute of limitations and a four-year statute of repose for legal-malpractice claims. However, she argued that House had fraudulently and intentionally concealed material facts from her regarding her claims; that “all of the time periods began to accrue from the time the fraud(s) were discovered”; that “neither the 2-year statute of limitation [n]or 4-year statute of repose began to run until 2 years after the discovery of the .acts as the basis of the suit or 4 years after the last act occurred.” She also asserted that, in addition to her discrimination claim against Stillman College, she also had a breach-of-contract claim against Stillman College.[2]
On July 29, 2013, the Cockrell defendants filed a reply to Pruitt’s response. They argued that Pruitt’s fraud and suppression claims were not pleaded in the complaint and were not separate from her legal-malpractice claims.
On January 8, 2014, the trial court granted the Cockrell defendants’ motion for a summary judgment in part and denied it in part. Specifically, it entered a summary judgment for the Cockrell defendants “[a]s to" direct liability, be it for negligence or wantonness, relating to the *331 handling of employment discrimination and breach of contract claims against Stillman College, employment discrimination against Averitt, and breach of contract against A+ Photograph/’; “[a]s to any direct liability under the theory of recovery for wantonness relating to the ear accident”; “as to any vicarious liability as to Defendant House’s fraud, wantonness, or negligence as to the handling of the employment discrimination and breach of contract against Stillman College, the employment discrimination against Averitt, and breach of contract against A+ Photography”; and “[a]s to any direct liability for the separate claims of fraud.” The trial court denied the Cockrell defendants’ motion for a summary judgment “as to any direct liability under the theory of recovery for negligence relating to the car accident”; “[a]s to any vicarious liability as to Defendant House’s fraud, wantonness, or negligence regarding the handling of the claim relating to the car accident”; and “[a]s to any vicarious liability as to Defendant House’s fraudulent conduct for separate claims of fraud” (Emphasis added.) Thus, the only remaining claims against the Cockrell defendants were claims regarding negligence as to the handling of the legal matters arising out of the automobile accident, vicarious liability for House’s actions in handling those matters, and vicarious liability as to the separate acts of fraud on House’s part alleged by Pruitt.
On January 23, 2014, Pruitt filed a motion asking the trial court to clarify its January 8, 2014, order. On February 4, 2014, the Cockrell defendants filed a motion to amend the trial court’s summary-judgment order. On February 6, 2014, the Cockrell defendants filed their response to Pruitt’s motion to clarify. On July 23, 2014, Pruitt filed a motion to certify the judgment to allow a permissive appeal to this Court. On April 30, 2015, the trial court entered its order denying the parties’ motions to clarify and to amend its January 8, 2014, order. However, it also entered an order certifying that its judgment was appropriate for a permissive appeal under Rule 5, Ala. R.App. P., and included five controlling questions of law. Pruitt and the Cockrell defendants then filed in this Court petitions for permissive appeal. This Court denied Pruitt’s petition for permissive appeal but granted the Cockrell defendants’ petition as to one of the questions certified by the trial court.

Discussion

The trial court’s certification included the following controlling question of law for permissive appeal:
“Whether acts of fraud committed by an attorney which defraud the client as to the status of the client’s underlying claim are actionable under the ALSLA separate and apart from the attorney’s failure to timely file suit on the underlying claim?”
This case presents a pure question of law. This Court has held: “ ‘ “[0]n appeal, the ruling on a question of law carries no presumption of correctness, and this Court’s review is de novo’” Rogers Found, Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala.1999) (quoting Ex parte Graham, 702 So.2d 1215, 1221 (Ala.1997)).” City of Prattville v. Corley, 892 So.2d 845, 847 (Ala.2003).
In answering the trial court’s question, we are guided by the following principles of statutory construction:
“Tn determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature.’ DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala.1998).
*332 “ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’
“Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293, 296 (Ala. 1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)).”
City of Prattville v. Corley, 892 So.2d at 848.
“In Archer v. Estate of Archer, 45 So.3d 1259, 1263 (Ala.2010), this Court described its responsibilities when construing a statute:
“ ‘ “ ‘[I]t is this Court’s responsibility in a case involving statutory construction to give effect to the legislature’s intent in enacting a statute when that intent is manifested in the wording of the statute.... “1 “ ‘[I]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.’ In determining the intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section.’
“ ‘ “Ex parte Exxon Mobil Corp., 926 So.2d 303, 309 (Ala.2005). Further, “ ‘ “ ‘when determining legislative
intent from the language used in a statute, a court may explain the language, but it may not detract from or add to the statute.... When the language is clear, there is no room for judicial construction.... ’ “ ‘ “Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 607 (Ala.2002).” ’
“(Quoting Ex parte Birmingham Bd. of Educ., 45 So.3d 764, 767 (Ala.2009).) Similarly, in Lambert v. Wilcox County Commission, 623 So.2d 727, 729 (Ala. 1993), the Court stated:
“ ‘ “The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute.... In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses ... and words are given their plain and usual meaning. ... Moreover, just as statutes dealing with the same subject are in pari materia and should be construed together, ... parts of the same statute are in pari materia and each part is entitled to equal weight.” ’
“(Quoting Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380-81 (Ala.1979).)”
First Union Nat’l Bank of Florida v. Lee Cty. Comm’n, 75 So.3d 105, 111-12 (Ala. 2011).
In its order on the Cockrell defendants’ motion for a summary judgment, the trial court framed Pruitt’s allegations regarding House’s separate acts of fraud as follows:
“Plaintiff alleges she should recover for separate acts of fraud under the ALSLA. She claims that the ‘final acts’ of fraud in each case are actionable.... The separate fraud claim dates are as follows: January 5, 2012 (issuance of a check related to Stillman College claims), January 2012 (misrepresentation of the disposition of her case against Averitt), February 2010 (issuance of the check related to the car accident), and June 2011 (issuance of a check related to A + Photography). Id. at p. 3-4 and 7.
*333 “ ‘The tort of fraudulent misrepresentation under § 6-5-101, Ala.Code 1975, requires “(1) a false representation, (2) regarding a material existing fact, (3) which the plaintiff relies upon, and (4) damages proximately caused by the misrepresentation.’” Boros v. Baxley, 621 So.2d 240, 242 (Ala.1993) (citation omitted).
“‘The elements of a cause of action for fraudulent suppression are: (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.’ Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61, 63 (Ala.1996).
"....
“VICARIOUS LIABILITY
"....

“Separate Acts of Fraud

“There is a question of whether Cock-rell Defendants are liable for Defendant House’s acts or omissions under an agency relationship theory for the separate acts of fraud. Since Plaintiff filed March 1, 2012, the dates from fraud claims in January 2012 [Stillman College and Averitt/i3] and June 2011 [A 4- Photography] were filed within the statute of limitation under the ALSLA. The fraud claim from February 2010 [Oyler accident] falls within the six-month savings provision under the ALSLA and was thus timely filed.
“Wherefore the Court DENIES Defendants’ Motion for Summary Judgment for any agency theory for the separate acts of fraud.”
(Capitalization in original.)
The Cockrell defendants argue that House’s fraudulent actions regarding Pruitt’s underlying claims were not actionable separately and distinctly under the ALSLA from claims relating to House’s failure to file suit on those claims. Thus, the Cockrell defendants argue that Pruitt’s legal-malpractice claims against them are barred by the four-year statute of repose set forth in Section 6-5-574, Ala.Code 1975, which provides:
“(a) All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided, further, that in no event may the action be commenced more than four years after such act or omission or failure; except, that an act or omission or failure giving rise to a claim which occurred before August 1, 1987, shall not in any event be barred until the expiration of one year from such date.
“(b) Subsection (a) of this section shall be subject to all existing provisions of law relating to the computation of statutory periods of limitations for the commencement of actions, namely, Sections 6-2-1, 6-2-2, 6-2-3, 6-2-5, 6-2-6, 6-2-8, 6-2-9, 6-2-10, 6-2-13, 6-2-15, 6-2-16, 6-2-17, 6-2-30, and 6-2-39; provided, that notwithstanding any provisions of such sections, no action shall be commenced more than four years after the act, omission, or failure complained of; except, that in the case of a minor under four years of age, such minor shall have until his or her eighth birthday to commence such action.”
(Emphasis added.)
Section 6-5-573, AIa.Code 1975, provides that “[t]here shall be only one form *334 and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein.”
Section 6-5-572, Ala.Code 1975, defines a “legal service liability action” as follows:
“(1) Legal service liability action. Any action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider’s violation of the standard of care applicable to a legal service provider. A legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future.”
(Emphasis added.)
This Court has held that the ALSLA “applies to a legal malpractice action based upon fraud. Leighton Avenue Office Plaza, Ltd. v. Campbell, 584 So.2d 1340 (Ala. 1991).” Voyager Guar. Ins. Co. v. Brown, 631 So.2d 848, 850 (Ala.1993). Further, this Court has held:
“[U]nder § 6-5-574(b), a legal malpractice action based on allegations of fraud must be commenced within two years after the discovery by the aggrieved party of the fact constituting the fraud; provided, however, that no action may be commenced more than four years after the act or acts constituting the fraud. The burden is on the plaintiff to show that he comes within the § 6-2-3 tolling provision. Lowe v. East End Memorial Hospital, 477 So.2d 339 (Ala. 1985). Russell v. Maxwell, 387 So.2d 156 (Ala.1980); Amason v. First State Bank of Lineville, 369 So.2d 547 (Ala.1979).”
Ex parte Seabol, 782 So.2d 212, 215 (Ala.2000) (emphasis added). However, this Court has not addressed the specific issue presented in this case—whether the ALS-LA allows a plaintiff to assert a fraud claim that is based on misrepresentations an attorney has made solely for purposes of concealing a potential legal-malpractice cause of action against him or her and that is separate and distinct from claims based on the underlying legal malpractice.
Nothing in the plain language of the ALSLA specifically precludes a claim based on an attorney’s fraudulent actions made for the purpose of concealing the fact that the plaintiff had a legal-malpractice claim against that attorney. The definition of a legal-service-liability action set forth in § 6-5-572(1) includes any action filed against a legal-service provider that is based on an injury or damage caused by a breach of the standard of care applicable to the legal-service provider. Further, § 6-5-572(1), Ala.Code 1975, provides that a legal-service-liability action embraces “all claims for injuries or damages.” Fraudulent misrepresentations by an attorney for the purpose of concealing the attorney’s malpractice that could likely result in a legal-malpractice claim against the attorney would obviously fit within the definition of a legal-service-liability action set forth in § 6-5-572(1), Ala.Code 1975. To hold otherwise would allow an attorney who has committed malpractice with regard to a client’s underlying legal claims to escape liability for that malpractice simply by engaging in an ongoing scheme of making intentionally false misrepresentations to the client regarding the status of the client’s underlying legal claims until the *335 four-year statute of repose for filing a legal-malpractice claim had expired.
In Ex parte Sonnier, 707 So.2d 635 (Ala.1997) (“Sonnier II ”), this Court addressed a similar issue with regard to medical-malpractice claims brought pursuant to the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-540 et seq., Ala.Code 1975 (“the AMLA”). This Court has held that “ ‘[t]he AMLA applies “[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care.” § 6-5-548(a), Ala.Code 1975.’ Mock v. Allen, 783 So.2d 828, 832 (Ala.2000).” Ex parte Vanderwall, 201 So.3d 525, 533 (Ala.2015) (emphasis omitted). Also, § 6-5-482, Ala.Code 1975, which sets forth limitations on the time for commencing a medical-malpractice action, contains a statute of limitations and statute of repose substantially similar to those set forth in the ALSLA.
In Sonnier II, this Court granted certio-rari review as to whether the Court of Civil Appeals’ decision in Talley v. Sonnier, 707 So.2d 631, 632 (Ala.Civ.App.1996) (“Sonnier I ”), conflicted with this Court’s previous decision in Jones v. McDonald, 631 So.2d 869 (Ala.1993), regarding application of the statute of limitations for medical-malpractice actions set forth in § 6-5-482, Ala.Code 1975. In addressing this issue, this Court stated:
“Because the Talleys [the plaintiffs] were the nonmovants in the summary judgment proceedings, we must consider the evidence in the light most favorable to their position. Renfro v. Georgia Power Co., 604 So.2d 408, 411 (Ala.1992). Mrs. Talley alleges that the defendants performed an unnecessary hysterectomy on her on April 1, 1991. For the sake of removing a supposed cervical cancer, the defendants removed Mrs. Talley’s uterus. Mrs. Talley also alleges that the defendants falsely represented to her, both before and after the hysterectomy, that she had had cancer and that the hysterectomy was necessary because of the cancer. In December 1994, Mrs. Talley read a magazine article about unnecessary hysterectomies. She asserts that she then obtained her 1991 hospital records and discovered that the 1991 diagnosis of cancer was incorrect. The Talleys filed this action on April 5, 1995, four years and four days after the hysterectomy. The circuit court entered a summary judgment for the defendants, who had moved for a summary judgment on the basis that the period of limitations had expired four days before the Talleys filed their complaint. The Court of Civil Appeals reversed, holding that ‘the evidence of these misrepresentations created a genuine issue of fact as to the date on which the claims would have been barred and that a jury could determine that on each visit a separate act of malpractice occurred.’
“Sections 6-5-480 et seq. and 6-5-540 et seq., Ala.Code 1975 (the ‘Alabama Medical Liability Act,’ hereinafter ‘AMLA’), govern medical malpractice actions in Alabama. Section 6-5-482(a) provides:
“‘[Medical malpractice actions] must be commenced within two years next after the act ... giving rise to the claim ...; provided, that if the cause of action is not discovered and could not reasonably have been discovered ■within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided further, that in no event may the action be *336 commenced more than four years after such act...
“Subsection (b) states that the tolling provisions appearing elsewhere in the Code shall apply to medical malpractice actions, but reiterates the rule that ‘no action shall be commenced more than four years after the act, omission, or failure complained of.’ This Court has held that the four-year period of repose in the AMLA is an ‘absolute bar to all medical malpractice claims which are brought more than four years after the cause of action accrues.’ Bowlin Horn v. Citizens Hospital, 425 So.2d 1065, 1070 (Ala.1982).
“There is no dispute that the complaint was filed more than two years after the date of the alleged malpractice. Therefore, if the complaint was timely, it was because of the operation of the provision that where the cause of action is not discovered within the two-year period an action may be commenced within six months after the discovery. The defendants do not dispute Mrs. Talley’s claim that she did not discover, and could not reasonably have discovered, before December 1994 that she had a cause of action arising from the hysterectomy and the subsequent treatment. It is also undisputed that the Talleys did file the complaint within six months after this discovery. The defendant doctors continued to treat Mrs. Talley until October 1991, less than four years before the complaint was filed on April 5, 1995.
“The limitations period for a medical malpractice action begins to run upon the accrual of a cause of action. Mobile Infirmary v. Delchamps, 642 So.2d 954, 958 (Ala.1994). Accrual occurs when the wrongful act ‘results in legal injury to the plaintiff.’ Id. In Delchamps, the plaintiff received a jaw implant and subsequently suffered bone degeneration. This Court held that the key inquiry in determining the accrual date of her claim was not the date of her surgery, or the date on which she became aware of the degeneration, but the time at which she first suffered the degeneration. 642 So.2d at 958. Mrs. Talley suffered the alleged legal injury caused by the performance of the hysterectomy not later than April 1, 1991. Therefore, any claims arising from the performance of the hysterectomy itself are barred by the four-year period of repose. The remaining question is whether the summary judgment was proper as to the claims based on alleged misrepresentations by Mrs. Talley’s doctors after her surgery.

"....

“To allow the subsequent misrepresentations to extend the statute of limitations as to malpractice relating to the hysterectomy, as the Talleys ask us to do, we would have to adopt the ‘continuing treatment rule,’ which was once accepted under Alabama law. At one time, the law was that ‘the statute begins to run when the relation of surgeon and patient ends with reference to the ailment treated.’ Hudson v. Moore, 239 Ala. 130, 133, 194 So. 147, 149 (1940). That law may still apply except in actions governed by the AMLA. In Moore v. Avert, 534 So.2d 250 (Ala.1988), an action against a podiatrist, this Court held that ‘the statute of limitations commences to run when the improper course of examination, and treatment if any, ... terminates.’ 534 So.2d at 254.
“Neither Hudson nor Avert was governed by the AMLA. This Court considered the continuing treatment rule in Jones v. McDonald, 631 So.2d 869 (Ala. 1993), and held that it did not apply in actions brought under the AMLA. In fact, the Court held that application of *337 the continuing treatment rule would be inconsistent with the provision that allowed for tolling the statute of limitations during periods before the injury could be discovered, concluding that the continuing treatment rule and the statutory tolling provision served virtually the same purpose. 631 So.2d at 872.
“The Talleys argue that the subsequent misrepresentations were separately actionable incidents of malpractice. These alleged misrepresentations took place after the surgery, from April 1991 until October 1991. Claims alleging misrepresentations made during the course of a doctor-patient relationship are claims of malpractice and are governed by the AMLA. Benefield v. F. Hood Craddock Clinic, 456 So.2d 52, 54 (Ala.1984). Therefore, the statutory limitations period for these alleged incidents of malpractice is also two years, although the running of that period would be tolled by Mrs. Talley’s inability to discover the fact that she had a cause of action. Because the Talleys allege that several of the misrepresentations were made after April 5, 1991, the four-year period of repose would not bar claims based on those incidents, if those incidents do give rise to actionable claims of malpractice.”
Sonnier II, 707 So.2d at 636-38 (emphasis added).
In this ease, after the statute of limitations had run on Pruitt’s underlying claims against Stillman College, Averitt/i3, and Oyler, House made intentional misrepresentations to Pruitt regarding the status of those cases. House also made intentional representations regarding the status of Pruitt’s case against A+ Photography. Additionally, House continued to make such representations regarding the status of Pruitt’s cases against Stillman College and Averitt/i3 until well after the time any legal-malpractice case against him would have been barred by the statute of repose set forth in § 6-5-574, Ala,Code 1975. As was the case in Sonnier II, those misrepresentations during the course of House’s representation of Pruitt would constitute claims of legal malpractice that are governed by the ALSLA. Thus, pursuant to the reasoning in Sonnier II, Pruitt could bring separate tort claims under the ALS-LA based solely on House’s fraudulent concealment of her malpractice claims against him. However,
“under § 6—5—574(b), a legal malpractice action based on allegations of fraud must be commenced within two years after the discovery by the aggrieved party of the fact constituting the fraud; provided, however, that no action may be commenced more than four years after the act or acts constituting the fraud.”
Ex parte Seabol, 782 So.2d at 215. Thus, Pruitt’s claims would be limited to misrepresentations House made to Pruitt regarding the status of her various actions during the four years preceding the filing of her complaint. Cf. Sonnier II, 707 So.2d at 638 (holding that, because the plaintiffs, who had filed their medical-malpractice complaint on April 5, 1995, “allege that several of the misrepresentations were made after April 5, 1991, the four-year period of repose would not bar claims based on those incidents, if those incidents do give rise to actionable claims of malpractice”). In this case, the trial court found that the separate fraud claims were based on the January 5, 2012, issuance of a check related to the Stillman College claims, the January 2012 misrepresentation to Pruitt regarding the disposition of her case against Averitt/i3, the February 2010 issuance of a check related to the car accident, and the June 2011 issuance of a check related to A+ Photography. All of these alleged acts of fraud occurred within *338 the four-year period preceding the filing of the complaint in this case.
To succeed on her legal-malpractice claims based on House’s fraudulent actions, Pruitt will be required to establish the elements of fraud and fraudulent suppression:
“Four elements must be proven in a fraud action: (1) There must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result. Crowne Investments, Inc. v. Bryant, [638 So.2d 873] (Ala.1994).”
Voyager Guar. Ins. Co. v. Brown, 631 So.2d 848, 850 (Ala.1993). The elements of fraudulent suppression are:
“(1) [T]he defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant’s suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result. Freightliner, LLC v. Whatley Contract Carriers, LLC, 932 So.2d 883, 891 (Ala.2005). ‘ “[A]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.”’ Cook’s Pest Control, Inc. v. Rebar, 28 So.3d 716, 726 (Ala.2009) (quoting McGarry v. Flournoy, 624 So.2d 1359, 1362 (Ala.1993)).”
Coilplus-Alabama, Inc. v. Vann, 53 So.3d 898, 909 (Ala.2010).
Because this is a permissive appeal, the question before us is limited to whether a fraud committed by an attorney who defrauds a client as to the status of the client’s underlying claim is actionable under the ALSLA separate and apart from the attorney’s failure to timely file a complaint on the underlying claim. Any questions as to whether Pruitt’s complaint adequately alleges a legal-malpractice claim based on the separate alleged acts of fraud and whether Pruitt can establish that she suffered damage as a result of the specific alleged fraudulent misrepresentations House made during the four-year period preceding the filing of the complaint are not properly before this Court. See BE&K, Inc. v. Baker, 875 So.2d 1185, 1189 (Ala.2003) (holding that “this Court will not expand its review on permissive appeal beyond the question of law stated by the trial court”).

Conclusion

A fraud committed by an attorney that defrauds the attorney’s client as to the status of the client’s underlying claim is actionable under the ALSLA separate and apart from the attorney’s failure to timely file a complaint on the underlying claim. Therefore, the trial court properly denied the Cockrell defendants’ motion for a summary judgment as to the malpractice claims alleging that the Cockrell defendants were vicariously liable for fraudulent misrepresentations House made to Pruitt to conceal the existence of an underlying legal-malpractice claim. Accordingly, we affirm the trial court’s order.
AFFIRMED.
STUART, BOLIN, MAIN, and BRYAN, JJ., concur.
SHAW, J., concurs in the result.
PARKER and MURDOCK, JJ., dissent.

. The complaint in this case refers to the plaintiff as “Juakeishia Vonshai Pruitt.” In other documents in the record, Pruitt is also identified as “Juakeishia Sims,” “Juakeishia Mosley,” and "Juakeishia Sims-Mosley.”

. The statute of limitations for a breach-of-contract claim is six years. • See § 6-2-3 4(a), Ala. Code 1975,